David M. Monachino (DM-1547)    JUDGE BATTS

'08 CIV 6124

Eddy Salcedo (ES-3391)
Seyfarth Shaw LLP
620 Eighth Avenue
New York, New York 10018
Tel: (212) 218-5500
Fax: (212) 218-5526

and

David Frazee (CA Bar No. 195375) (*admission pro hac vice pending*)
David R. Burtt (CA Bar No. 201220) (*admission pro hac vice pending*)
Jonmi N. Koo (CA Bar No. 231336) (*admission pro hac vice pending*)
Perkins Coie LLP
101 Jefferson Drive
Menlo Park, California 94025-1114
Tel: (650) 838-4300
Fax: (650_ 838-4350

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EASTWEST INTERNATIONAL (TAIWAN) ENTERPRISES, a corporation formed under the laws of Taiwan (ROC); and VICTORIA POINT CORPORATION, a corporation formed under the laws of the British Virgin Islands, | Case No.: |
| Plaintiffs, | COMPLAINT (JURY TRIAL DEMANDED) |
| -against- | |
| JOSEPH DELGRECO & COMPANY, INC., a corporation formed under the laws of the State of New York; and JOSEPH DELGRECO, an individual; | |
| Defendants. | |

        Plaintiffs Eastwest International (Taiwan) Enterprises and Victoria Point Corporation

(collectively, "Plaintiffs"), by their attorneys Seyfarth Shaw LLP and Perkins Coie LLP, as and

NY1 26520140.1

for their complaint against defendants Joseph DelGreco & Company, Inc. and Joseph DelGreco (collectively, "Defendants"), allege as follows:

## NATURE OF THE ACTION

1.      This action involves Defendants' continued exploitation of their purported joint venture partnership with a Taiwanese manufacturer and distributor of high-end outdoor furniture products.  Owing more than $2,000,000 to Plaintiffs and unable to pay, Defendants have resorted to self-help and converted Plaintiffs' property while offering nothing more than hollow promise after hollow promise to make good on their contractual obligations.  This action has become necessary to protect Plaintiffs' property rights and to foreclose on the collateral securing Defendants' unfulfilled debt.

## JURISDICTION AND VENUE

2.      Jurisdiction of this Court is founded upon 28 U.S.C. §1332 based on diversity of citizenship of all parties and the amount in controversy, exclusive of interest and costs, exceeding the sum of seventy-five thousand dollars ($75,000).

3.      The venue in this action is proper in the Southern District of New York pursuant to 28 U.S.C. §§1391(a)(1), 1391(a)(2), 1391(a)(3), and 1391(c).

## PARTIES

4.      Plaintiff Eastwest International (Taiwan) Enterprises ("Eastwest") is a corporation formed under the laws of Taiwan, with its principal place of business located in

Taiwan, ROC.  Amongst other things, Eastwest manufactures and distributes high-end outdoor furniture products.

5.      Plaintiff Victoria Point Corporation ("VPC") is a corporation formed under the laws of the British Virgin Islands, with its principal place of business located there.  Part of VPC's business is to process Eastwest's invoices for payment and to act as a limited agent of Eastwest on specified matters.

6.      Upon information and belief, defendant Joseph DelGreco & Company, Inc., ("DelGreco & Co.") is a New York corporation, which designs and markets high-end outdoor furniture products and related accessories.  DelGreco & Co.'s principal office and place of business is located at 232 East 59th Street, New York City, New York  10022.

7.      Upon information and belief, Defendant Joseph DelGreco, an individual, is the President and majority owner of DelGreco & Co., and he resides in both Annandale, New Jersey, and New York City.

## FACTS APPLICABLE TO ALL CAUSES OF ACTION

A.    **The Promissory Note and Security Agreement**

8.      On or about September 26, 2007, DelGreco & Co. executed a Promissory Note memorializing the terms of a one million dollar ($1,000,000) loan made by Eastwest in favor of DelGreco & Co. (the "Note").  Attached hereto as Exhibit A is a true and correct copy of the Note.

9.    As security for, among other obligations, the $1,000,000 loan made on September 26, 2007, DelGreco & Co. executed a security agreement (the "Security Agreement") pursuant to which DelGreco & Co. granted Eastwest a security interest in all of DelGreco & Co.'s tangible and intangible rights, interests, properties, and assets, including but not limited to its accounts, inventory, negotiable instruments, equipment, general intangibles and chattel paper, and all proceeds thereof (collectively, the "Collateral").

10.    Eastwest perfected its security interest in the Collateral by filing a Uniform Commercial Code Financing Statement (the "Financing Statement") with the New York Secretary of State on September 27, 2007.  Attached hereto as Exhibits B and C are true and correct copies of the Security Agreement and the Financing Statement filed with the Secretary of State.  Eastwest incorporates by reference, and thereby alleges, the content of the Security Agreement and the Financing Statement as if set forth herein in full.

11.    By virtue of the Security Agreement, the Note, the $1,000,000 loan, and the filing of the Financing Statement, Eastwest's security interest in the Collateral was perfected in accordance with applicable provisions of the New York Uniform Commercial Code on September 27, 2007.

12.    Defendant DelGreco & Co. has failed to make certain payments as those obligations came due under the Note, and despite written request, has failed and refused to allow Eastwest prompt and reasonable access to inspect the Collateral and the books and records of DelGreco & Co. in violation of section 3(j) of the Security Agreement.

**B.    The Distribution Agreement**

13.    On or about September 26, 2007, DelGreco & Co. and Eastwest executed an Exclusive Production, Distribution, and License Agreement ("Distribution Agreement"). Attached hereto as Exhibit D is a true and correct copy of the Distribution Agreement which has a term of fifteen (15) years from its Effective Date. *See* Ex. D, ¶2.

14.    The Distribution Agreement grants Eastwest the exclusive right to manufacture, produce, distribute, market, and sell certain of DelGreco & Co.'s products. *See id.*, ¶3.1(ii). DelGreco & Co. also granted Eastwest an exclusive license to distribute the Licensed Products for DelGreco & Co. for sale within the United States.

15.    The Licensed Products include certain products designed by one of DelGreco & Co.'s exclusive designers Mr. Glyn Peter Machin, including Mr. Machin's Oceanside and Siesta Chaise line of products. *See id.*, at p. 14 (Schedule of Licensed Products).

16.    The Distribution Agreement also provides that Eastwest's warehousing and distribution facility in North Carolina "***shall*** become the United States Distribution Center for all Licensed Product" covered by the Distribution Agreement. *See id.*, ¶7 (emphasis added). By contract, all products covered by the Distribution Agreement must be initially delivered to Eastwest in North Carolina for distribution in the United States.

**C.    The Sale of the Machin Goods to Plaintiffs and Defendants' Conversion**

17.    In around November 2007, Glyn Peter Machin A/S, a design company owned by Mr. Machin, became interested in selling its inventory of DelGreco & Co. branded products

- 5 -

("Machin Goods"). On information and belief, Mr. Machin resided and currently resides in Denmark where he had possession of the Machin Goods.

18. The Machin Goods consisted of outdoor furniture based on DelGreco & Co.'s Oceansand and Siesta Chaise designs, which products are Licensed Products pursuant to paragraph 1.3 and Schedule 1 of the Distribution Agreement. Distribution of all Licensed Products must be handled exclusively through Eastwest's North Carolina warehouse pursuant to paragraph 7 of the Distribution Agreement.

19. On information and belief, around November 2007 DelGreco & Co. entered into an agreement with Glyn Peter Machin A/S to purchase the Machin Goods. However, DelGreco & Co. could not afford to purchase the Machin Goods for the contract price of more than $368,000.

20. Eastwest, through VPC, then agreed to purchase the Machin Goods.

21. As of December 8, 2007, Glyn Peter Machin A/S had completed delivery of the Machin Goods to Oasiq, Eastwest's warehouse facility in Belgium.

22. At or around this time, Glyn Peter Machin A/S delivered an invoice to Oasiq evidencing Eastwest's purchase of the Machin Goods.

23. Prior to shipping the Machin Goods to the United States in June 2008, Eastwest had already sold some of the Machin Goods to one of its customers, distributed the goods from its Belgian warehouse, collected the entire amount on the invoice, and credited DelGreco & Co.'s amounts owed with the royalty payment pursuant to the Distribution Agreement.

NY1 26520140.1

24.    At all relevant times, Defendants reaffirmed to Plaintiff that the Machin Goods would ultimately be delivered –pursuant to the Distribution Agreement – from Belgium to Norfolk, Virginia, after which they would be transported to Eastwest's warehouse facility in North Carolina for distribution.

25.    The June 21, 2008 Bill of Lading stated that the Machin Goods were to be shipped to Norfolk, Virginia (where Plaintiffs understood the goods would be transported via land to Eastwest's North Carolina warehouse pursuant to the Distribution Agreement).

26.    Around May 2008, the business relationship between Eastwest and Defendants began to deteriorate. Mr. DelGreco complained that Eastwest's North Carolina fulfillment center was inadequate to serve his needs, and threatened to relocate the inventory to a different fulfillment center "more familiar" with the outdoor furniture industry or to otherwise find an alternative fulfillment contractor.

27.    With the business relationship further deteriorating, DelGreco & Co.'s business partner Mr. Machin voided the invoice he sent to Plaintiffs evidencing their purchase of the Machin Goods. Subsequent to its destruction of the invoices, Glyn Peter Machin A/S continued to accept payment from Plaintiffs for the Machin Goods.

28.    Defendants also intentionally and without Plaintiffs' knowledge or consent took steps to divert the shipment of Plaintiffs' property directly to Defendants in New York City where Defendants intend to dispose of the property, thereby preventing Eastwest from being able to honor its existing obligations to deliver this property.

- 7 -

29.     On information and belief, the Machin Goods are no longer destined for Eastwest's warehouse in North Carolina, but are either already in Defendants' possession or are en route to DelGreco & Co.'s warehouse in New York.

30.     On information and belief, at no time did DelGreco & Co. or Mr. DelGreco make any payment to Glyn Peter Machin A/S for the purchase of the Machin Goods, which consideration was required to complete the purchase agreement with Glyn Peter Machin A/S.

## FIRST CAUSE OF ACTION

### (CONVERSION)

31.     Plaintiffs incorporate by reference the allegations of paragraphs 1 through 30 of this complaint as though fully set forth here.

32.     Plaintiffs are the rightful owners of the Machin Goods.

33.     Plaintiffs are the only party to have paid Glyn Peter Machin A/S for the purchase of the Machin Goods, the majority of which goods were delivered to and stored at Eastwest's Belgium warehouse prior to shipping to the United States. Up until the time when the Machin Goods were crated for shipment to the United States, Plaintiffs always maintained full control over the Machin Goods and had previously sold a portion of these goods to a customer without any protest from DelGreco & Co. Plaintiffs also credited towards balances owed by DelGreco & Co. a royalty payment for the sale of the Machin Goods pursuant to the Distribution Agreement.

34.     DelGreco & Co. has paid nothing for the Machin Goods, and erroneously claims that the several hundred thousand dollars which Plaintiffs' paid for the Machin Goods was an

- 8 -

undocumented "loan" to DelGreco & Co.  Plaintiffs never agreed to loan DelGreco & Co. *more* money for the purpose of purchasing the Machin Goods.

35.     On information and belief, DelGreco & Co. has informed Glyn Peter Machin A/S that Plaintiffs' payment for the Machin Goods was a "loan," which representation convinced Glyn Peter Machin A/S to divert the shipment of the Machin Goods from their scheduled route to North Carolina directly to DelGreco & Co. in New York City.

36.     DelGreco & Co. wrongfully acquired Plaintiffs' property when it purposefully, maliciously, and without Plaintiffs' consent, diverted the shipment of the Machin Goods from Norfolk, Virginia, to New York City.

37.     Plaintiffs are entitled to recover from DelGreco & Co. for the actual damages sustained by Plaintiffs as a result of DelGreco & Co.'s wrongful acts described in this complaint. The amount of such damages will be proven at trial.

38.     Because DelGreco & Co. acted with oppression, malice, and fraud, Plaintiffs are entitled to an award of punitive damages.

## SECOND CAUSE OF ACTION

## (BREACH OF CONTRACT/INJUNCTIVE RELIEF)

39.     Eastwest incorporates by reference the allegations of paragraphs 1 through 38 of this complaint as though fully set forth here.

40.    According to the Distribution Agreement between DelGreco & Co. and Eastwest, Eastwest's North Carolina warehousing and distribution facility is the mandatory distribution center for all Licensed Products in the United States.

41.    The Machin Goods are Licensed Products.

42.    Eastwest has performed all conditions, covenants, and promises required on its part to be performed in accordance with the Distribution Agreement.

43.    DelGreco & Co. materially breached the Distribution Agreement by failing to perform its obligations thereunder in that it, among other things, knowingly diverted the Machin Goods - which were en route to Eastwest's North Carolina facility via Norfolk, Virginia - to DelGreco & Co.'s warehouse in New York City.

44.    As a direct and proximate result of DelGreco & Co.'s breach of the Distribution Agreement, Eastwest has been damaged in an amount to be determined at trial.

45.    As a direct and proximate result of DelGreco & Co.'s breach of the Distribution Agreement, Eastwest has further suffered and will continue to suffer irreparable harm, including but not limited to continuing conversion, alteration, or destruction of its unique property, to wit, the Machin Goods, and the continuing loss of goodwill because it is unable to fullfil its obligations tied to the prompt delivery of the Machin Goods improperly taken by DelGreco & Co. Eastwest is informed and believes, and based thereon alleges, that unless DelGreco & Co. is enjoined, it will continue to inflict such irreparable harm. Eastwest's remedy at law is not in and of itself adequate to compensate it for the harm inflicted by DelGreco & Co with respect to its

continuing loss of goodwill and loss of the unique Machin Goods.  Accordingly, Eastwest is entitled to injunctive relief.

## THIRD CAUSE OF ACTION

## (FORECLOSURE ON COLLATERAL)

46.    Eastwest incorporates by reference the allegations of paragraphs 1 through 45 of this complaint as though fully set forth here.

47.    Defendant DelGreco & Co. has failed to make certain payments as those obligations came due under the Note.

48.    Despite written request, Defendants have failed and refused to allow Eastwest prompt and reasonable access to inspect the Collateral and the books and records of DelGreco & Co. in violation of section 3(j) of the Security Agreement.

49.    The interest of Eastwest in the Collateral is superior to the interests, if any, of Defendants and each of them.

50.    Defendants' conduct as alleged herein constitutes a breach of the Security Agreement and an event of default under Note and the Security Agreement.

51.    As a result of Defendants' defaults under the Note and the Security Agreement, Eastwest is entitled to immediate possession of the Collateral so that Eastwest may offer it for sale as provided in the Security Agreement and apply the proceeds to the balance due Eastwest from Defendants.

52.    Eastwest is entitled to a decree foreclosing the interests of Defendants, and each of them, in the Collateral.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for the following:

A.    For a preliminary and permanent injunction restraining Defendants, their agents, servants, representatives, and attorneys, and those in active concert or participation with them, from the following:

(1)    exploiting, selling, altering, destroying, converting, or otherwise possessing their property, including but not limited to the Machin Goods;

(2)    delivering or causing to deliver the Machin Goods to anywhere other than Eastwest's warehouse facilities in North Carolina; and

(3)    depriving Eastwest of its contractual right and/or license as an exclusive distributor under the Distribution Agreement.

B.    For an Order directing Defendants to file with the Court and serve on Plaintiffs within thirty (30) days after the service on Defendants of such injunction a report in writing, under oath, setting forth in detail the manner and form in which Defendants have complied with the injunction;

C.    For damages to be proven at trial;

D.    For an Order awarding Plaintiffs punitive damages in a sum to be determined at trial, on the basis of Defendants' willful and deliberate unauthorized access to Plaintiffs' property;

- 12 -

NY1 26520140.1

E.    For a decree determining that Plaintiff Eastwest's interest in the Collateral is adjudged to be a first and prior lien on the Collateral, superior to any right, title, claim, lien or interest on the part of the named Defendants or any persons claiming by, through or under said Defendants or either of them; and

(1)    Foreclosing Defendants' interest in the Collateral;

(2)    Directing Defendants to assemble and turn over possession and control of the Collateral and all proceeds thereof to Plaintiff;

(3)    Allowing Plaintiff Eastwest to sell the Collateral, at its option, pursuant to the provisions of the Uniform Commercial Code or at sheriff's sale;

(4)    In the event that the Collateral is not surrendered promptly to Plaintiff Eastwest, that Plaintiff Eastwest shall be entitled to a writ of assistance directing the Marshal to deliver possession of the Collateral to Plaintiff; and

(5)    In the event the proceeds of sale, after allowance for costs, expenses and reasonable attorney fees as provided in  the Security Agreement are insufficient to satisfy the Judgment, the deficiency may be enforced by execution as provided by law;

F.    For prejudgment interest;

G.    For an Order awarding Plaintiffs their attorneys' fees and costs; and

- 13 -

H.    For an Order awarding Plaintiffs such other and further relief as the Court deems proper and just.

Dated: July 3, 2008

Respectfully submitted,

By: *Eddy Salcedo*

David M. Monachino (DM 1527)
Eddy Salcedo (ES 3391)
Seyfarth Shaw LLP
620 Eighth Ave
New York, New York  10018
Tel: (212) 218-5500
Fax: (212) 218-5526

and

David Frazee (CA Bar No. 195375)
*(admission pro hac vice pending)*
David R. Burtt (CA Bar No. 201220)
*(admission pro hac vice pending)*
Jonmi N. Koo (CA Bar No. 231336)
*(admission pro hac vice pending)*
Perkins Coie LLP
101 Jefferson Drive
Menlo Park, California  94025-1114
Tel: (650) 838-4300
Fax: (650_ 838-4350

*Attorneys for Plaintiffs*

- 14 -

# 1:08-civ-06124-DAB

EASTWEST INTERNATIONAL et al.

v.

JOSEPH DELGRECO & COMPANY, INC. et al.

Deborah A. Batts, presiding

# EXHIBIT A

**TO COMPLAINT (JURY TRIAL DEMANDED)**

**PROMISSORY NOTE**

US$1,000,000.00                                                    New York, New York
                                                                   September 26, 2007

1.    **Promise to Pay.** FOR VALUE RECEIVED, Joseph DelGreco & Company, Inc., a corporation formed under the laws of the State of New York ("Borrower"), promises to pay to the order of East-West-International (Taiwan) Enterprises, a corporation formed under the laws of Taiwan, ROC ("Lender"), on or before the "Maturity Date" (as defined below), the Loan Amount (as defined below), plus interest thereon as provided in this Promissory Note (this "Note").

2.    **Loan Documents.** This Note is given pursuant to a loan (the "Loan") in the principal amount of One Million Dollars (US$1,000,000.00) (the "Loan Amount") by Lender to Borrower and is secured by a security interest granted by Borrower in the Collateral described in that certain Security Agreement of even date herewith (the "Security Agreement"), executed by Borrower in favor of Lender, and by that certain Continuing Guaranty executed by Joseph DelGreco, personally, in favor of Lender, also of even date herewith (the "Guaranty"). (This Note, the Security Agreement, the Guaranty, and all other agreements, documents and instruments securing or relating to the Loan, are herein collectively called the "Loan Documents.")

3.    **Place Manner of Payment.** Subject to all applicable provisions of this Note and the other Loan Documents, all payments hereunder shall be made to Lender at 15th Floor-3, No. 447, Section 3 Wen-Shin Road, Taichung, Taiwan, ROC, or at such other place as the holder of this Note may from time to time designate. All payments under this Note shall be made in lawful money of the United States, by wire transfer funds, cashier's or certified checks, or Borrower's checks delivered to Lender. Borrower's checks shall constitute payment only when collected, provided that Lender shall use commercially reasonable efforts to facilitate prompt collection of such checks.

4.    **Interest.** Interest shall accrue on the outstanding balance of the Loan Amount, and on each subsequent loan disbursement in excess of such Loan Amount (if any) made by Lender to Borrower hereunder (which Lender may but shall not be obligated to make), from the date of disbursement until paid, at the rate of seven percent (7%) per annum ("Interest Rate"), subject only to the Default Interest Rate as set forth and defined in Paragraph 8 of this Note and applicable law, pursuant to Paragraph 13.4 of this Note. Notwithstanding anything in this paragraph 4 to the contrary, under no circumstances shall Lender be obligated to make any disbursements or advance any funds to Borrower in excess of the Loan Amount.

5.    **Payments.**

      5.1    <u>Payment of Interest</u>. Borrower shall pay Lender, upon execution and delivery of this Note, prepaid interest on the outstanding balance of the Loan Amount from the first date of funding the Loan to, but not including, the first day of the month following the month in which the Loan is first funded, appropriately prorated. Thereafter, monthly payments of interest accrued on the outstanding balance of the Loan Amount shall be due and payable in arrears on or before the fifth day of the month following the month in which such interest accrued, with the first such payment to be made on or before the fifth day of the second full month following the month in which the Loan is first funded, and

Page 1 of 5

continuing until the Loan Amount, with interest thereon, and all applicable fees, costs, and expenses, are paid in full.

5.2    <u>Payment of Principal</u>. Borrower shall make sixteen (16) quarterly payments of principal in the amount of Fifty Thousand Dollars (US$50,000.00) each commencing on March 31, 2009, and continuing on each June 30, September 30, December 31, and March 31 thereafter through December 31, 2012.

5.3    <u>Payment at Maturity</u>. All remaining principal and unpaid interest thereon and other costs, fees, and charges payable under this Note shall be all due and payable on the Maturity Date (defined below).

6.    **Late Charge.** In the event the full amount of any installment payment on the Note is not received by the holder hereof on or before the due date, the undersigned agrees to pay the holder hereof a late charge equal to one and one-half percent (1.5%) of the aggregate dollar amount not timely paid, in addition to the amount of such installment. Such late charge is in addition to and not in lieu of any other remedy available to Lender under any of the Loan Documents or applicable law and exercised by Lender in its discretion. In the event the holder of this Note accepts tender of payment by check or other negotiable instrument, subsequently dishonored for any reason, Borrower agrees to pay a sum for additional damages for collection in the amount of $25.00 per item.

7.    **Disbursements.** Disbursement of the Loan Amount shall be made by Lender to Borrower in a single installment upon Lender's receipt and approval in its discretion of a UCC release or termination signed by Laurie Korobkin, as secured party, of that certain security interest in the Collateral (as defined in the Security Agreement), or part thereof, in her favor evidenced by UCC financing statement recorded with the New York Department of State as File No. 200501280137481, and written proof of payment and satisfaction in full of the obligation secured thereby, in the amount of $400,000.00.

8.    **Default Interest Rate.** The rate of interest per annum equal to three hundred (300) basis points in excess of the Interest Rate (the **"Default Interest Rate"**) computed on the basis of the actual number of days elapsed from the occurrence of a default under this Note or any other Loan Document, until its cure or correction (provided that the default is capable of cure or correction) using a three hundred sixty five (365) day year.

9.    **Maturity Date.** The term of this Loan shall be 64 months. The principal balance of the Loan and accrued but unpaid fixed interest shall be payable on or before January 31, 2013 (the **"Maturity Date"**).

10.    **Prepayment.** Borrower may prepay all or any part of the Loan at any time, without penalty.

11.    **Security for Note.** This Note is secured by the Security Agreement and the security interest granted by Borrower to Lender therein, and by the Guaranty.

12.    **Defaults and Charges.** Upon the occurrence of an event of default by Borrower under this Note or any other Loan Document, or any termination of that certain Exclusive Production, Distribution, and Licensing Agreement among Borrower, Lender, and Partrade Trading Company, LLC executed concurrently herewith, Lender in its sole discretion may exercise any of

PROMISSORY NOTE

the remedies available to it under any or all of the Loan Documents or applicable law, including the option to declare immediately due and payable the entire unpaid principal balance of this Note together with all accrued interest, including all interest accrued at the Default Rate (if any), and other charges due and payable by Borrower to Lender. Borrower agrees to pay all reasonable costs of collection when incurred, including without limitation reasonable attorneys' fees, whether or not suit is filed. If any suit or action is instituted to enforce this Note or any of the Loan Documents, the prevailing party shall receive, in addition to its costs allowed by law, reasonable attorneys' fees in such suit or action.

13.  **Miscellaneous.**

13.1  <u>Waiver of Notices.</u> Except as otherwise expressly set forth in this Note or any other Loan Document and by such terms applicable hereto, Borrower and all persons liable or to become liable on this Note hereby waive notice, presentment, protest, demand, notice of protest, dishonor and nonpayment of this Note, and any and all other notices or matters of a like nature, consent to any and all renewals and extensions of the time of repayment hereof, and agree further that at any time and from time to time, without notice, the security described in any documents at any time securing this Note may be released in whole or in part, or increased, changed or exchanged by agreement between the holder hereof and any owner of any collateral affected thereby, without in any way affecting the liability of any party to this Note, any endorser, any guarantor, or any person or entity liable or to become liable with respect to any indebtedness evidenced hereby.

13.2  <u>No Waiver.</u> No failure to exercise, and no delay in exercising any right, power or remedy hereunder or under any document delivered pursuant hereto or in connection with the Loan, shall impair any right, power or remedy which Lender may have, nor shall any such delay be construed to be a waiver of any such rights, powers or remedies or an acquiescence in any breach or default under this Note or any document delivered pursuant hereto or in connection with the Loan, nor shall any waiver or any breach or default of Borrower be deemed a waiver of any default or breach previously or subsequently occurring.

13.3  <u>Governing Law.</u> This Note shall be governed by and interpreted in accordance with the laws of the State of New York, without reference to its conflicts of laws principles.

13.4  <u>Compliance With Laws.</u> Borrower and Lender intend to comply with all laws with respect to the charging and receiving of interest. If the amounts charged or received by Lender hereunder and/or under any of the Loan Documents that are deemed to be interest are individually or collectively determined to be in excess of the maximum rate or amount permitted to be charged or received under applicable laws, the excess shall be deemed to be a prepayment of principal when paid, without premium and any portion of the excess not capable of being so applied will be refunded to Borrower.

13.5  <u>Notice.</u> All notices, requests, demands, claims and other communications permitted or required to be given hereunder must be in writing and shall be deemed duly given and received (i) if personally delivered, when so delivered, (ii) if sent by electronic facsimile, once transmitted to the fax number specified below and the appropriate telephonic confirmation is received, provided that a copy of such notice, request, demand, claim or other communication is promptly thereafter sent in accordance with the provisions of

clause (iii) hereof, or (iii) if sent through an overnight delivery service in circumstances to which such service guarantees next day delivery, the day following such notice, request, demand, claim or other communication having been so sent:

| | |
|---|---|
| If to Borrower: | Joseph DelGreco & Company, Inc.<br>Attn: Joseph DelGreco<br>232 East 59th Street<br>New York, NY (USA) 10022<br>Tel.: 212-688-5310<br>FAX: 212-688-5207 |
| With a copy to: | DLA Piper US, LLP<br>Attn: David Mason, Esq.<br>1251 Avenue of the Americas<br>New York, NY (USA) 10020<br>Tel.: (212) 335-4500<br>FAX: (212) 335-4501 |
| If to Lender: | East-West-International (Taiwan) Enterprises<br>Attn: Robert Chang<br>15th Floor-3, No. 447, Section 3 Wen-Shin Road<br>Taichung, Taiwan, ROC<br>Tel.: 011-886-4-2297-9313<br>FAX: 011-886-4-2297-5083 |
| With a copy to: | Solomon Grindle Silverman & Spinella, APC<br>Attn: Christopher A. Lidstad, Esq.<br>12651 High Bluff Drive, Suite 300<br>San Diego, CA 92130<br>Tel.: (858) 793-8500<br>FAX: (858) 793-8263 |

13.5    Counterparts.  This Note may be executed in several counterparts, each of which when so executed shall be considered as an original and all of which together shall constitute one agreement.

IN WITNESS WHEREOF, Borrower has executed this Note as of the date first above written.

**Borrower:**

JOSEPH DELGRECO & COMPANY, INC.,
a New York corporation

By: _____
    Joseph DelGreco
Its: President

STATE OF NEW YORK          )
                           ) ss.
COUNTY OF ___New york___   )

On __Oct 29 2007__, before me, ____Susan John____, Notary Public, personally appeared Joseph DelGreco, known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument, the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____
Signature

SUSAN JOHN
Notary Public, State of New York
No. 01JO6054594
Qualified in Queens County
My Commission Expires May 30 '(Seal)'
March 30 2011

PROMISSORY NOTE

Page 5 of 5

# 1:08-civ-06124-DAB

EASTWEST INTERNATIONAL et al.
v.
JOSEPH DELGRECO & COMPANY, INC. et al.

Deborah A. Batts, presiding

# EXHIBIT B

**TO COMPLAINT (JURY TRIAL DEMANDED)**

## SECURITY AGREEMENT

This Security Agreement ("**Agreement**") is made as of September 26, 2007, by JOSEPH DELGRECO & COMPANY, INC., a corporation formed under the laws of the State of New York ("**Debtor**"), in favor of EAST-WEST-INTERNATIONAL (TAIWAN) ENTERPRISES, a corporation formed under the laws of Taiwan, ROC ("**Secured Party**").

### Recitals

A.      Concurrently herewith, Debtor has made and given to Secured Party that certain Promissory Note (the "**Note**"), secured in part by that certain Continuing Guaranty made by Joseph DelGreco, individually, in favor of Secured Party, which instruments together with this Agreement set forth the terms of a loan from Secured Party to Debtor in the principal amount of One Million Dollars (US$1,000,000.00) (the "**Loan**").

B.      This is the Security Agreement described in the Note, further securing Debtor's obligations thereunder, with respect to the Collateral (as hereinafter defined).

NOW, THEREFORE, in consideration of the Secured Party's agreement to make the Loan, and for other valuable consideration, the receipt and adequacy of which are hereby acknowledged, Debtor hereby agrees as follows:

### Agreement

1.      **Grant of Security Interest**. For valuable consideration, and to secure the payment and performance of the obligations hereinafter described, Debtor hereby assigns and grants to Secured Party, pursuant to Article 9 of the Uniform Commercial Code, a security interest in all of Debtor's right, title and interest in that certain property described in Schedule 1 attached hereto and incorporated herein by this reference (all of which shall be referred to herein collectively as the "**Collateral**"), and hereby consents and authorizes Secured Party to record or file such UCC financing statements as Secured Party may in its sole discretion, subject to an obligation of accuracy, deem necessary or appropriate to perfect, protect, preserve, or renew the security interest granted to Secured Party herein.

2.      **Obligations Secured**. This Agreement and the security interest created hereby are given for the purpose of securing:  (a) payment of the indebtedness evidenced by the Note; (b) performance of each agreement of Debtor herein contained; (c) payment and performance of all existing and future indebtedness and obligations of Debtor to Secured Party validly arising under the Note or this Agreement; (d) payment and performance of all existing and future obligations of Debtor to Secured Party which are evidenced by a writing which states that they are secured hereby; and (e) any and all amendments, modifications, renewals and/or extensions of any of the foregoing, including but not limited to amendments, modifications, renewals or extensions which are evidenced by new or additional instruments, documents or agreements.

3.      **Representations and Warranties**.  Debtor represents, warrants and agrees that: (a) Debtor has full title to the Collateral, free from any liens, encumbrances, defenses or other claims; (b) the security interest in the Collateral constitutes a first, prior and indefeasible

security interest; (c) as of the date of this Agreement, no financing statement covering the Collateral, or any part thereof, is on file in any public office, except in favor of Secured Party, or any financing statement covering the Collateral, or any part thereof, that is on file in any public office as of the date of this Agreement in favor of any person or entity other than Secured Party shall be released, terminated, and removed of record, and the obligation secured thereby shall be paid and satisfied in full, within ten (10) days after the date hereof and as a condition precedent to any obligation by Secured Party to make any disbursement of the Loan Amount (as defined in the Note); (d) Debtor will execute all documents and take such other action as Secured Party reasonably deems necessary (including, upon request by Secured Party, filing one or more financing statements with any public office) to create and perfect a security interest in the Collateral; (e) Debtor will at its sole cost and expense, and to Secured Party's reasonable satisfaction, defend, settle or otherwise dispose of any claims that may be made against the Collateral; (f) the Collateral will be maintained in good condition and repair, and will not be used, sold, or transferred in violation of any applicable laws, rules, or regulations; (h) Debtor will pay and discharge all taxes and liens on the Collateral prior to delinquency; (i) Debtor will maintain insurance on the Collateral covering such risks and in such form and amount as may be reasonably required by Secured Party from time to time, with insurers reasonably satisfactory to Secured Party and with loss payable to Secured Party as its interest may appear, and upon request Debtor will deliver the original of such policy or policies to Secured Party; (j) Debtor will permit Secured Party reasonable and prompt access from time to time on written request for the purpose of inspecting the Collateral and Debtor's books and records pertaining thereto; and (k) the Collateral will at all times remain personal property.

4.      **Information Regarding Collateral.**  Secured Party may, from time to time, request Debtor to request and obtain from obligors indebted on the Collateral, if any, information concerning the same.  If (a) an event of default has occurred, and (b) Debtor unreasonably refuses or fails to cooperate with Secured Party's request for information under this Section 4 or to obtain the requested information within a reasonable time from one or more obligors on the Collateral, then Secured Party may request such information directly from the affected obligor(s).

5.      **Disposal of Collateral.**  So long as no event of default shall have occurred hereunder, and subject to the Loan Agreement, Debtor may, in the ordinary course of its business: (a) sell or otherwise dispose of any Collateral consisting of inventory; and (b) receive and dispose of collections on the Collateral.

6.      **Cure by Secured Party.**  In the event that Debtor, after due notice as set forth in Section 7 below, shall default in its performance of any obligation hereunder, Secured Party may, but shall not be obligated to, perform the same, and the reasonable cost thereof shall be payable by Debtor to Secured Party immediately and without demand, and any unpaid amounts shall bear interest at the Default Interest Rate under the Note and shall be secured by this Agreement.

7.      **Default.**  There shall be a "default" or an "event of default" hereunder upon the occurrence of any of the following events: (a) default in the payment or performance of any obligation secured hereby or contained herein and the continuance of such default for ten (10) days after written notice of default from Secured Party to Debtor at the address for notice

provided in the Note; (b) breach of any representation or warranty contained herein and the continuance of such breach for ten (10) days after written notice of default from Secured Party to Debtor at the address for notice provided in the Note; or (c) occurrence of any "default" or "event of default" under the Note or any other security document or any other obligation secured hereby or any security therefor. Nothing herein is intended or shall be construed to be a grant by Secured Party to Debtor of any grace period or other delay in Secured Party's right to enforce strictly its right to timely payment of interest, principal, and other charges as set forth in the Note.

8.    **Secured Party's Rights Upon Default**. Upon the occurrence of any default or event of default, all obligations secured hereby shall, at Secured Party's option, immediately become due and payable without notice or demand, and Secured Party shall have in any jurisdiction where enforcement hereof is sought, in addition to all other rights and remedies which Secured Party may have under law, all rights and remedies of a secured party under the Uniform Commercial Code and, in addition, the following rights and remedies, all of which may be exercised with or without further notice to Debtor: (a) to settle, compromise or release on terms acceptable to Secured Party, in whole or in part, any amounts owing on the Collateral; (b) to enforce payment and prosecute any action or proceeding with respect to any and all of the Collateral; (c) to extend the time of payment, make allowances and adjustments and issue credits in Secured Party's name or in the name of Debtor; (d) to foreclose the liens and security interests created under this Agreement or under any other agreement relating to the Collateral by any available judicial procedure or without judicial process; (e) to enter any premises where any Collateral may be located for the purpose of taking possession of or removing any Collateral; (f) to remove from any premises where any Collateral may be located, the Collateral and any and all documents, instruments, computer hardware and software, files and records, and any receptacles and cabinets containing the same, relating to the Collateral, and Secured Party may, at Debtor's cost and expense, use the supplies and space of Debtor at any or all of its places of business as may be necessary or appropriate to properly administer and control the Collateral or the handling of collections and realizations thereon; and (g) to sell, assign, lease, or otherwise dispose of the Collateral or any part thereof, either at public or private sale, in lots or in bulk, for cash, on credit or otherwise, with or without representations or warranties, and upon such terms as shall be acceptable to Secured Party, all at Secured Party's sole option and as Secured Party in its sole discretion may deem advisable. Debtor irrevocably appoints Secured Party its true and lawful attorney in fact, which appointment is coupled with an interest, for purposes of accomplishing any of the foregoing. The net cash proceeds resulting from the collection, liquidation, sale, lease or other disposition of the Collateral shall be applied, first, to the reasonable expenses (including reasonable attorneys' fees) of retaking, holding, storing, processing and preparing for sale, selling, collecting, liquidating and the like, and then to the satisfaction of all obligations and indebtedness secured hereby. Such proceeds shall be applied to particular obligations and indebtedness, or against principal or interest, in Secured Party's absolute discretion. Debtor will, at Secured Party's request, assemble all Collateral and make it available to Secured Party at such place or places as Secured Party may designate which are reasonably convenient to both parties, whether at the premises of Debtor or elsewhere, and will make available to Secured Party all premises and facilities of Debtor wherein Collateral may be located for the purpose of Secured Party's taking possession of the Collateral or removing or putting the Collateral in saleable form. Debtor agrees to pay all reasonable costs and expenses incurred by Secured Party in the

enforcement of this Agreement, including without limitation reasonable attorneys' fees, whether or not suit is filed hereon.

9.      **Interpretation.**  This Agreement may not be altered or amended except with the written consent of each of the parties.  This Agreement shall be binding upon and inure to the benefit of the respective heirs, executors, administrators, assigns and successors of the parties hereto.  The term "Secured Party" shall mean the holder and owner, including any pledgee or assignee, of the Note or other obligations secured hereby whether or not named as the Secured Party herein.  All of Secured Party's rights and remedies hereunder are cumulative and not exclusive, and are in addition to all rights and remedies provided by law or under any other agreement between Debtor and Secured Party, or otherwise.  Where the context permits, the plural term shall include the singular, and vice versa.  Where more than one person, partnership, corporation or other entity executes this Security Agreement as Debtor, their liability hereunder shall be joint and several.  This Security Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without reference to its conflicts of laws principles.

IN WITNESS WHEREOF, the undersigned has caused this Security Agreement to be executed as of the day and year first above written.

**"DEBTOR"**

JOSEPH DELGRECO & COMPANY, INC.,
a New York corporation

By: _____
     Joseph DelGreco

Its:   President

## SCHEDULE 1

### Collateral

Schedule 1 to Security Agreement executed by or on behalf of Joseph DelGreco & Company, Inc., as "Debtor," to East-West-International (Taiwan) Enterprises, as "Secured Party," dated as of September 25, 2007.

This Security Agreement covers the following types or items of property:

All of the tangible and intangible assets, rights, interests, and properties of Joseph DelGreco & Company, Inc. of every kind and nature, wherever located and by whomever possessed, and all of the proceeds of the foregoing, all whether now owned or existing or hereafter arising or acquired, including without limitation the following:

1.    all of Debtor's present and future accounts (as the term "account" is defined in the Uniform Commercial Code as adopted by or applied in the State of New York) and other present and future receivables including, without limitation, any right to payment under a letter of credit through which any such account or other receivable is to be paid and any promissory note, bill of exchange or other instrument evidencing or issued in place of or in satisfaction of any such account or other receivable or pursuant to which any such account or other receivable is to be paid;

2.    any guarantee or collateral securing any of the foregoing;

3.    any other tangible and intangible personal property of the Debtor of whatsoever nature and kind and wheresoever situated, whether the property of the Debtor now or in the future, including, without limitation:  "general intangibles", "goods" (including, without limitation, "inventory" and "equipment"), "chattel paper", "documents" and "instruments", as such terms are defined in the Uniform Commercial Code as adopted by or applied in the State of New York; and

4.    the proceeds from any of the foregoing, including without limitation proceeds from any insurance insuring the same against risk of loss or nonpayment.

1

# 1:08-civ-06124-DAB

EASTWEST INTERNATIONAL et al.
v.
JOSEPH DELGRECO & COMPANY, INC. et al.

Deborah A. Batts, presiding

# EXHIBIT C

## TO COMPLAINT (JURY TRIAL DEMANDED)

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO:  (Name and Address)

> EAST-WEST-INTERNATIONAL (TAIWAN)
> ENTERPRISES
> c/o Solomon Grindle Silverman & Spinella
> Attn:  Christopher A. Lidstad, Esq.
> 12651 High Bluff Drive, Suite 300
> San Diego, CA  92130

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| JOSEPH DELGRECO & COMPANY, INC. | | | | |
| OR 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 232 EAST 59TH STREET | NEW YORK | NY | 10022 | USA |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| Not Applicable | | CORPORATION | NEW YORK | ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |
| OR 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| Not Applicable | | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| EAST-WEST-INTERNATIONAL (TAIWAN) ENTERPRISES | | | | |
| OR 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| C/O 12651 HIGH BLUFF DRIVE, SUITE 300 | SAN DIEGO | CA | 92130 | USA |

4. This FINANCING STATEMENT covers the following collateral:

**SEE ATTACHED DESCRIPTION OF COLLATERAL**

| 5. ALTERNATIVE DESIGNATION [if applicable]: | LESSEE/LESSOR | CONSIGNEE/CONSIGNOR | BAILEE/BAILOR | SELLER/BUYER | AG. LIEN | NON-UCC FILING |
|---|---|---|---|---|---|---|
| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.    Attach Addendum | | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | | All Debtors | Debtor 1 | Debtor 2 |
| 8. OPTIONAL FILER REFERENCE DATA | | | | | | |

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

**Description of Collateral**
Attachment to UCC Financing Statement

**Debtor:**          Joseph DelGreco & Company, Inc.

**Secured Party:**   East-West-International (Taiwan) Enterprises

**Collateral:**

All of the tangible and intangible assets, rights, interests, and properties of Joseph DelGreco & Company, Inc. of every kind and nature, wherever located and by whomever possessed, and all of the proceeds of the foregoing, all whether now owned or existing or hereafter arising or acquired, including without limitation the following:

1.      all of Debtor's present and future accounts (as the term "account" is defined in the Uniform Commercial Code as adopted by or applied in the State of New York) and other present and future receivables including, without limitation, any right to payment under a letter of credit through which any such account or other receivable is to be paid and any promissory note, bill of exchange or other instrument evidencing or issued in place of or in satisfaction of any such account or other receivable or pursuant to which any such account or other receivable is to be paid;

2.      any guarantee or collateral securing any of the foregoing;

3.      any other tangible and intangible personal property of the Debtor of whatsoever nature and kind and wheresoever situated, whether the property of the Debtor now or in the future, including, without limitation:   "general intangibles", "goods" (including, without limitation, "inventory" and "equipment"), "chattel paper", "documents" and "instruments", as such terms are defined in the Uniform Commercial Code as adopted by or applied in the State of New York; and

4.      the proceeds from any of the foregoing, including without limitation proceeds from any insurance insuring the same against risk of loss or nonpayment.

# 1:08-civ-06124-DAB

EASTWEST INTERNATIONAL et al.
v.
JOSEPH DELGRECO & COMPANY, INC. et al.

Deborah A. Batts, presiding

# EXHIBIT D

## TO COMPLAINT (JURY TRIAL DEMANDED)

## EXCLUSIVE PRODUCTION, DISTRIBUTION, AND LICENSE AGREEMENT

THIS EXCLUSIVE PRODUCTION, DISTRIBUTION, AND LICENSE AGREEMENT ("Agreement") is made and entered into as of September 26, 2007 ("Effective Date"), by and among EAST-WEST-INTERNATIONAL (TAIWAN) ENTERPRISES, a corporation formed under the laws of Taiwan, ROC ("Licensee"), and JOSEPH DELGRECO & COMPANY, INC., a corporation formed under the laws of the State of New York ("Licensor") (such parties are sometimes referred to hereinafter individually as a "Party" and collectively as the "Parties").

### Recitals

A.     Licensor is in the business of designing, marketing for sale, and selling outdoor furniture and accessories.  In connection with that business, Licensor owns all right, title, and interest in and to the "DelGreco" brand name as used in the manufacture, distribution, and sale of outdoor furniture and accessories.

B.     Licensee, through certain of its wholly-owned subsidiaries and affiliates, is in the business of manufacturing, warehousing and distributing in the United States and worldwide various manufactured goods, including but not limited to outdoor furniture and accessories.

C.     Licensor has requested from Licensee, and Licensee is willing to provide to Licensor, a loan in the amount of One Million Dollars (US$1,000,000.00) (the "Loan"), subject to the covenants, terms, and conditions set forth in that certain Promissory Note (the "Note") to be made by Licensor in favor of Licensee, the maturity of which is set forth in the Note, together with that Continuing Guaranty, that certain Security Agreement, and any and all other documents and instruments to be executed and/or delivered concurrently with the Note and this Agreement (collectively, the "Loan Documents").

D.     Licensee desires to obtain from Licensor, and Licensor desires to grant to Licensee, subject to the covenants, terms, and conditions set forth in this Agreement, an exclusive license to manufacture outdoor furniture and accessories under the DelGreco brand name, to distribute the same to Licensor and its affiliates for sale within the United States and Canada, and to distribute and sell (or cause or permit others to distribute and sell in accordance with the terms of this Agreement) the same anywhere in the world outside the United States and Canada.

NOW, THEREFORE, in consideration of the Parties mutual exchange of promises set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

## Agreement

1.    **Definitions.** As used in this Agreement, the following terms shall have the following meanings:

1.1.    "Gross Receipts" shall mean and include all revenues directly or indirectly received by Licensee's manufacturer from or for the manufacture of Retail Products or International Products, as the case may be, excluding taxes, duties, and charges for freight and insurance, and after deduction for credits or refunds for items damaged or returned. Gross Receipts do not include Licensee's receipts from any Licensed Product manufactured and supplied at reduced prices by Licensee to any distributor, sub-distributor, reseller, or affiliate for advertising, promotional, display, or other reasonable purposes.

1.2    "International Products" shall mean and include all Licensed Products sold anywhere outside the United States and Canada during the Term.

1.3.    "Licensed Products" shall mean and include all outdoor furniture and related accessories based on the designs set forth in Schedule 1, which is attached hereto and incorporated herein by reference, as the same may be amended from time to time by agreement of all Parties, that are manufactured, produced, or sold during the Term under any of the Marks, including but not necessarily limited to Trade Products, Retail Products, and International Products.

1.4    "Marks" shall mean and include the "DelGreco" brand name for outdoor furniture and related accessories, including all related trademarks, trade names, trade dress owned by Licensor and used or useful in the manufacture, distribution, and sale of the Licensed Products.

1.5    "Retail Products" shall mean and include all Licensed Products sold during the Term by or through any store, showroom, outlet, chain, retailer, or other location or seller within the United States and Canada, other than through the Trade Showroom Network.

1.6    "Trade Products" shall mean and include all Licensed Products sold by Licensor through the Trade Showroom Network during the Term.

1.7    "Trade Showroom Network" shall mean and include the New York trade showroom owned and/or operated by Licensor as of the Effective Date, all other trade showrooms (if any) opened and operated by Licensor during the Term, all trade showrooms not owned or operated by Licensor through which Licensor as of the Effective Date sells or has an existing contract or established relationship to sell Trade Products, and all such affiliated trade showrooms with which Licensor enters into such a contract or relationship from and after the Effective Date, as well as any sales representatives employed, contracted with, trained and/or overseen by Licensor who is not employed by or under contract with or to Licensee.

Page 2

2.    **Term.** This term of this Agreement (including any renewals and extensions hereof, the "Term") shall commence on the Effective Date and continue thereafter for a period of fifteen (15) years, unless sooner terminated or renewed pursuant to the terms hereof.

3.    **Grant of Exclusive License.**

3.1    Exclusive License.    Licensor hereby grants to Licensee an exclusive, irrevocable (except as hereinafter provided), license during the Term:

(i)    to manufacture and produce the Trade Products solely for and on behalf of Licensor, to distribute the Trade Products solely to Licensor and its affiliates in the Trade Showroom Network, and to use and reproduce the Marks for all purposes necessary or appropriate in connection with such manufacture, production, and distribution, subject to the terms and conditions set forth in this Agreement; and

(ii)    to manufacture, produce, distribute, market, and sell the Retail Products within the United States and Canada, and the International Products everywhere outside of the United States and Canada, and to use and reproduce the Marks for all purposes necessary for such manufacture, production, distribution, marketing, and sale, subject to the terms and conditions set forth in this Agreement.

3.2    Conditions of License.    The license granted under this Agreement is contingent upon and subject to Licensee's use of the Marks in accordance with the terms hereof and in conformance with Licensor's applicable trademark usage policies, which shall be communicated to Licensee from time to time by Licensor. All uses and placement of the Marks, including, without limitation, the graphic representation of the Marks, shall be subject to Licensor's prior written approval, which approval shall not be unreasonably withheld. Licensee shall not use any of the Marks as part of its domain name, corporate or business names, or otherwise imply that they are owned or controlled by or otherwise affiliated with Licensor. Licensee shall not use any Marks in any manner that implies or suggests a relationship with Licensor other than that which is set forth in this Agreement. Licensee acknowledges and agrees that it has no right, title or interest in any Marks, except for the license expressly granted under this Section 3. Any rights in or to any Marks accruing through the use thereof by Licensee shall inure solely to benefit of Licensor. Licensee shall not take any action that is inconsistent with Licensor's ownership of the Marks. Without limiting the foregoing, Licensee shall not use any third party trademarks, trade names, logos or other commercial or product designations in a manner that is likely to cause confusion with respect to the Marks.   Licensee's rights to use the Marks, and all other licenses granted hereunder, shall cease immediately upon expiration or earlier termination of this Agreement (at all times performing in a way satisfactory to Licensor), except strictly as provided in Section 14 of this Agreement.

3.4    Reservation of Rights.    Any and all rights not expressly granted to Licensee herein shall remain exclusively with Licensor.

4.    Royalties.    Licensor shall be entitled to payment by Licensee of royalties in connection with Licensee's sale of Licensed Products, with no guaranteed minimum royalty, in accordance with this Section 4.

4.1    Trade Products.    Licensor shall pay for the Trade Products in accordance with Section 9 of this Agreement. Licensor shall not be entitled to payment of any royalty by Licensee or any other person or entity from the sale of any Trade Products. In addition, Licensor is responsible for any royalty payments that are owed to any third party designers entitled to any royalties stemming from Licensor's sale of any Trade Products.

4.2    Retail Products.    Licensee shall pay to Licensor a royalty of seven percent (7.0%) of Gross Receipts from the sale of any Retail Products. Licensor is responsible for any royalty payments that are owed to any third party designers entitled to any royalties stemming from the manufacture, distribution, or sale of any Retail Products.

4.3    International Products.    Licensee shall pay to Licensor a royalty of seven percent (7.0%) of Gross Receipts from the sale of any International Products. Licensor is responsible for any royalty payments that are owed to any third party designers entitled to any royalties stemming from the manufacture, distribution, or sale of any International Products.

4.4    Payment of Royalties.    Royalties payable from Licensee to Licensor under this Agreement shall be paid quarterly with respect to each three-month period ending March 31, June 30, September 30 and December 31 during the Term. Such payments will be made within thirty (30) days after the end of each such calendar quarter, and each payment will be accompanied by a statement of Gross Receipts for the three-month period involved. Notwithstanding the foregoing, the first royalty payment will be payable with respect to the period commencing on the Effective Date and continuing through December 31, 2007, and shall be due on or before January 30, 2008. Licensee may but shall not be obligated to offset against royalties payable to Licensor hereunder any amounts then owed and past due for longer than thirty (30) days from Licensor to Licensee for or related to Licensor's purchase of Trade Products. Licensee's obligation to pay royalties to Licensor hereunder shall terminate immediately upon the expiration or earlier termination of this Agreement.

4.5    Records.    Licensee agrees that it will at all times keep complete, true, and correct books of account containing a current record of sales and Gross Receipts in sufficient detail to enable the royalties payable under this Agreement to be computed and verified. Licensee further agrees to permit Licensor or its duly authorized representative or, at Licensor's option, a qualified auditor, to inspect such records at Licensee's North Carolina distribution facility, during such facility's normal business hours, by appointment upon not less than thirty (30) days prior, written request and no more than twice during any twelve (12) month period during the Term, at Licensor's sole cost and expense except as provided below. For purposes of this Section 4.5, the

term "qualified auditor" shall mean a reputable, experienced, certified public accountant who, individually or through any past or present employer or principal, has no existing or prior personal or professional relationship with Licensor, and who is not engaged to conduct the audit on a contingency basis. In the event the audit reasonably determines royalties payable to Licensor for any period during the Term of six (6) months or longer exceeds the royalties actually paid or promised to Licensor for the same period by more than five percent (5%), Licensor shall be entitled to reimbursement for the cost of such audit and remit payment for any outstanding royalties within thirty (30) days after Licensee's receipt of the notice of the results of such audit and a complete copy of the audit report.

5.    **Manufacturing.** Except as otherwise provided in this Agreement, Licensee shall have the exclusive right and obligation during the Term to manufacture and produce all Licensed Products on behalf of Licensor pursuant to this Agreement. Designs for the Licensed Products existing as of the Effective Date shall be provided by Licensor to Licensee for use in manufacturing the Licensed Products. Subject to Licensor's final written approval, all modifications to such designs and any new Licensed Products designs shall be developed through the input and cooperation of both Parties, and both Parties shall collaborate to increase Licensed Products offerings in accordance with market conditions and other appropriate factors and considerations. Nothing in this Agreement shall impair or preclude Licensee from manufacturing, producing, distributing, or selling any goods of any nature or kind whatsoever other than the Licensed Products. Similarly, nothing in this Agreement shall impair or preclude Licensor from manufacturing, producing, distributing, or selling any goods of any nature or kind whatsoever that do not bear any of the Marks.

6.    **Quality Control.** All Licensed Products manufactured by Licensee hereunder shall conform to the applicable quality standards and specifications for such Licensed Products as mutually agreed by the parties from time to time ("Specifications"). Licensee shall maintain appropriate test and inspection procedures to ensure maintenance of such standards of quality. Licensee shall test the Licensed Products for compliance with the respective Specifications, and shall provide to Licensor written certification at the time of each shipment that the Licensed Products meet such Specifications at the time of shipment and delivery from Licensee's manufacturing facilities. Licensee shall maintain written records of its tests of the Licensed Products for a period of five (5) years after shipment of such Licensed Products from Licensee's manufacturing facilities and shall make such records available for inspection by Licensor at Licensee's principal U.S. manufacturing facility for the License Products, during such facility's normal business hours, by appointment upon not less than thirty (30) days prior, written request or such shorter period of time as Licensee and Licensor may agree in writing. No material deviation from such Specifications and no material change to any Licensed Products, to Licensee's manufacturing methods, or to the raw materials used therein, shall be made by Licensee, in each case without the prior written consent of Licensor. Additionally, Licensee agrees to comply with all applicable laws in performing its obligations. Similarly, Licensee shall, and shall use commercially reasonable efforts to cause any and all resellers and sub-distributors appointed by Licensee to, adhere to any quality standards as may be mutually agreed to by Licensee and Licensor from time to time. In any event, at a minimum Licensee shall, and

shall cause any and all resellers and sub-distributors appointed by Licensee to: (a) perform its and their obligations in a professional, workmanlike manner in accordance with industry standards; (b) conduct its and their business in a manner that reflects favorably on Licensor and the Licensed Products; (c) not engage in deceptive, misleading or unethical practices; and (d) comply with all applicable laws.

7.    **Distribution.** Upon the Effective Date, Licensee's North Carolina warehousing and distribution facility shall become the United States Distribution Center for all Licensed Products. Except as otherwise provided in this Agreement, Licensee shall have the exclusive right and obligation during the Term to provide, at its cost, secure storage and efficient distribution of all Licensed Products between and among Licensee's manufacturing facilities and warehouses, and the Trade Showroom Network, as well as to any seller or sub-distributor of Retail Products or International Products in accordance with any separate sales or distribution agreement between Licensee and any such seller or sub-distributor. Licensee agrees to maintain an initial base stock inventory of Trade Products equal to approximately five hundred thousand dollars ($500,000). The base stock inventory for Trade Products will be adjusted by mutual agreement among Licensee and Licensor quarterly based on sales through the Trade Showroom Network, manufacturing and distribution capacity, market factors, and other considerations. Both Parties shall collaborate to increase distribution channels for Licensed Products in accordance with market conditions and other appropriate factors and considerations. Without limiting the foregoing, Licensee shall use commercially reasonable efforts to maximize distribution and sales of the Licensed Products (excluding Trade Products).

7.1.    Existing Stock. On or before the Effective Date, Licensee shall pick up from Licensor's Edison, New Jersey, warehouse all existing stock of Licensed Products in Licensor's possession, except such products as have been sold but not delivered to customers or as Licensor may elect to hold for future sale. Licensor and Licensee shall share equally the cost of such pick-up and delivery. Licensor shall be entitled to a credit against outstanding invoices issued to Licensor by Victoria Point Corporation (Licensee's invoicing agent) for such stock, based on factory invoice prices. Nothing in this Agreement shall relieve Licensor of its obligation to pay Licensee (or Victoria Point Corporation, as the case may be) for any invoice (or partial amount thereof) that remains outstanding and unpaid after application of all such credits, and Licensor shall pay all such invoices and amounts within thirty (30) days after the Effective Date.

7.2.    Trade Products Cushions. Licensee shall be responsible, at Licensee's sole cost and expense, for manufacturing and providing, or causing to be manufactured and provided, all cushions for all Trade Products, using exterior-grade foam, and all covers for such cushions, using fabric to be selected and supplied by Licensor and/or Licensor's customers, in accordance with reasonable standards and specifications to be developed and agreed upon by Licensor and Licensee

Page 6

8.    **Sales.**

    8.1.    <u>Trade Products</u>. Licensor shall have all rights and responsibilities for all sales during the Term of Trade Products anywhere within the United States and Canada. Such sales shall be conducted through the Trade Showroom Network and by sales representatives employed, contracted with, trained, and/or overseen by Licensor.

    8.2.    <u>Retail Products and International Products</u>. Licensee shall have all rights and responsibilities for all sales during the Term of Retail Products within the United States and Canada and of International Products anywhere else in the world.

9.    **Pricing.** All Retail Products and International Products shall be sold in accordance with price schedules determined by Licensee. Prices for all Trade Products shall be mutually agreed to by Licensor and Licensee and shall at a minimum result in a gross profit of forty five percent (45%) for Licensor from the sale of such Trade Products; provided, however, that as an inducement to Licensee to accommodate such minimum gross profits and as a condition of the same, Licensor agrees that at least two-thirds of that minimum gross profit (i.e., a 30% commission) shall be paid to trade showrooms in the Trade Showroom Network, other than trade showrooms owned and operated by Licensor, to enhance sales of Trade Products for the benefit of both Parties. All Trade Products shall be sold to and purchased by Licensor on a cash-before-delivery (CBD) basis, FOB Licensee's North Carolina warehouse.

10.    **Promotion.**

    10.1    <u>Trade Products</u>. Marketing, advertising, and promotion of the Trade Products, and all costs incurred therefore, shall be the responsibility of Licensor. Licensee shall have no obligation to promote or pay for any promotional expenses for or related to the Trade Products.

    10.2    <u>Retail Products and International Products</u>. Marketing, advertising, and promotion of the Retail Products and the International Products, and all costs incurred therefore, shall be the responsibility of Licensee. Licensor shall have no obligation to promote or pay for any promotional expenses for or related to the Retail Products or the International Products.

11.    **Representations and Warranties.** Each Party makes the following representations and warranties for the benefit of each other Party:

    (i)    it has all necessary right and power to enter into this Agreement and to fully perform its obligations hereunder;

    (ii)   it has not made, nor will it make, any commitment to a third party in conflict with or in derogation of its rights and obligations under this Agreement;

(iii)   it is not aware of any legal limitation, including patents, licenses, or other intellectual property rights of any nature of any third party, that could prevent it from entering into and carrying out the provisions of this Agreement;

(iv)   it is a body corporate validly existing under the laws of the place of its incorporation and is capable of suing and being sued in its own name;

(v)    it is subject to and bound by the covenants, terms, and conditions of this Agreement, which is a valid and binding obligation enforceable in accordance with its terms, subject to any statute of limitations and any laws of bankruptcy, insolvency, liquidation, reorganization or similar laws generally affecting creditors' rights and to general equitable principles;

(vi)   it acknowledges and agrees that the other Party has entered into this Agreement in reliance on the representations and warranties in this Section 11.

12.   **Indemnification.**

12.1   **Indemnification.** Each Party ("Indemnitor") shall indemnify, defend and hold harmless the other Party, its affiliates and their respective directors, officers, shareholders, employees and agents ("Indemnitee"), from and against any and all third party claims (including all losses, obligations, liabilities, damages, recoveries, costs and expenses, including court costs and reasonable attorneys fees, relating thereto) (collectively, "Losses") arising out of or in connection with: (a) any violation or infringement by Indemnitor upon any common law or statutory rights of any third party, including rights relating to copyrights, patents, trade marks, contractual rights or trade secret rights (other than to the extent caused by and attributable to the acts or omissions of Indemnitee); (b) any breach of or any failure to observe or perform any of Indemnitor's covenants, representations, warranties or obligations under this Agreement; (c) with respect to Licensee as Indemnitor, any product liability or defect, including any death, illness, personal injury or property damage, arising out of or in connection with the manufacture, distribution, or other disposition of the Licensed Products (other than to the extent caused by and attributable to the acts or omissions of Licensor); and (d) with respect to Licensor as Indemnitor, any product liability or defect, including any death, illness, personal injury or property damage, arising out of or in connection with any designs or specifications provided to Licensee by or on behalf of Licensor, of, or for any Licensed Product (other than to the extent caused by or attributable to the acts or omissions of Licensee).

12.2   **Indemnification Procedures.** In connection with any claim for which a Party seeks indemnification hereunder from another Party, the Party seeking indemnification: (a) shall give the Indemnitor prompt written notice of the claim, provided, however, that failure to provide such notice shall not relieve the Indemnitor from its liability or obligation hereunder,

except to the extent Indemnitor is prejudiced thereby; (b) shall reasonably cooperate with the Indemnitor, at the Indemnitor's expense, in connection with the defense and settlement of the claim; and (c) shall permit the Indemnitor to control the defense and settlement of the claim; provided, however, that the Indemnitor may not settle the claim without the Indemnitee's prior written consent, which shall not be unreasonably withheld or delayed. Notwithstanding the above, the Indemnitee, at its cost, may participate in the defense of the claim through counsel of its own choosing and shall so participate to the extent any action or proceeding includes one or more claims against Indemnitee that are not covered by or subject to the Indemnification obligations pursuant to Section 12.1.

13.    **Default.** In the event of any material breach of this Agreement, the Party alleging such breach shall give written notice of the breach to the breaching Party, including sufficient detail to enable the breaching Party reasonably to determine or understand (i) the act(s) or omission(s) by which the breach is alleged to have occurred, and (ii) the act(s) or omission(s) required or sufficient to cure the breach. If the specified breach has not been cured, whether by the specified cure or otherwise, within thirty (30) days of the breaching Party's receipt of written notice of the breach, the Party alleging the breach may terminate this Agreement by written notice given in accordance with Section 15.

14.    **Termination.** Any Party may terminate this Agreement in the event of any material breach hereof, where such breach remains uncured for a period of thirty (30) days following written notification of such breach in accordance with Section 13, by written notice to the other Party. Unless a longer period is stated in the termination notice, the termination shall be effective on the date ("Termination Date") that is thirty (30) days after the breaching Party's receipt of the termination notice.

14.1    <u>Acceleration of Note Upon Termination.</u> Notwithstanding anything in this Agreement or any of the Loan Documents to the contrary, upon the termination of this Agreement by Licensor or Licensee, and Licensee's election in its sole and absolute discretion by written notice to Licensor, the Loan and the Note evidencing the Loan shall immediately become all due and payable.

14.2    <u>Post-Termination Rights.</u> Notwithstanding anything in this Agreement to the contrary, Licensee shall have the following rights with respect to the manufacture, distribution, and sale of Licensed Products after Licensee's giving or receipt of notice of any termination of this Agreement:

    (i)    to continue and complete the production and delivery of any Licensed Products that are in process upon Licensee's giving or receipt of such notice, or for which materials have as of such time been received or irrevocably ordered by Licensee that cannot in Licensee's reasonable judgment be converted to other profitable uses, and Licensee shall be entitled to payment therefor in

accordance with this Agreement and any pricing or payment arrangements then in effect related hereto;

(ii)  to continue for a period of thirty (30) days after the Termination Date to distribute and sell to Licensor any Trade Products that are on-hand in Licensee's inventory as of the Termination Date, and Licensee shall be entitled to payment therefor in accordance with this Agreement and any pricing or payment arrangements then in effect related hereto;

(iii) to continue for a period of thirty (30) days after completion to distribute and sell to Licensor any Trade Products that are in process and being completed by Licensee as of the Termination Date in accordance with Section 14.2(i), and Licensee shall be entitled to payment therefor in accordance with this Agreement and any pricing or payment arrangements then in effect related hereto;

(iv)  to continue for a period of six (6) months after the Termination Date to distribute, market, and sell any Retail Products and International Products that are on-hand in Licensee's inventory as of the Termination Date;

(iv)  to continue for a period of six (6) months after completion to distribute, market, and sell any Retail Products and International Products completed by Licensee after the Termination Date in accordance with Section 14.2(i); and

(v)  to distribute, market, and sell any Trade Products that Licensor has not claimed, accepted, taken delivery of, and paid for in accordance with the terms of this Agreement and any pricing or payment arrangements then in effect related hereto, within the applicable time periods stated in Section 14.2(ii), and to apply the net proceeds of any such sale to payment of any amounts due and payable from Licensor to Licensee hereunder or under the Note.

Nothing in this Agreement shall relieve Licensee from the payment of any royalties accrued prior to the effective date of expiration or termination of this Agreement, it being acknowledged and agreed that such obligations shall survive any termination or expiration of this Agreement; provided, however, that Licensee may but shall not be obligated to offset against any amounts due and payable from Licensor to Licensee hereunder or under the Note any royalties payable to Licensor for Licensed Products sold after the Termination Date.

EXCLUSIVE PRODUCTION, DISTRIBUTION, AND LICENSE AGREEMENT

15.    **Additional Provisions.**

15.1    <u>Notice</u>.  All notices, requests, demands, claims and other communications permitted or required to be given hereunder must be in writing and shall be deemed duly given and received (i) if personally delivered, when so delivered, (ii) if sent by electronic facsimile, once transmitted to the fax number specified below and the appropriate telephonic confirmation is received, provided that a copy of such notice, request, demand, claim or other communication is promptly thereafter sent in accordance with the provisions of clause (iii) hereof, or (iii) if sent through an internationally-recognized delivery service, upon written or electronic confirmation from the delivery service that such notice, request, demand, claim or other communication having been so delivered:

|  |  |
|---|---|
| If to Licensor: | Joseph DelGreco & Company, Inc.<br>Attn: Joseph DelGreco<br>232 East 59th Street<br>New York, NY (USA) 10022<br>Tel.: (212) 688-5310<br>FAX: (212) 688-5207 |
| With a copy to: | DLA Piper US, LLP<br>Attn: David Mason, Esq.<br>1251 Avenue of the Americas<br>New York, NY (USA) 10020<br>Tel.: (212) 335-4500<br>FAX: (212) 335-4501 |
| If to Licensee: | East-West-International (Taiwan) Enterprises<br>Attn: Robert Chang<br>15th Floor-3, No. 447, Section 3 Wen-Shin Road<br>Taichung, Taiwan, ROC<br>Tel.: 011-886-4-2297-9313<br>FAX: 011-886-4-2297-5083 |
| With a copy to: | Solomon, Grindle, Silverman & Spinella, A.P.C.<br>Attn: Christopher A. Lidstad, Esq.<br>12651 High Bluff Drive, Suite 300<br>San Diego, CA 92130<br>Tel.: (858) 793-8500<br>FAX: (858) 793-8263 |

15.2    <u>Entire Agreement</u>.    This Agreement contains the entire understanding between the Parties and supersedes any prior understandings and agreements between or among them with respect to the subject matter of this Agreement.

15.3    Amendment. This Agreement may not be altered or modified except by a written amendment signed by both Parties.

15.4    Construction. This Agreement was prepared through the mutual input, effort, and negotiation of both Parties, and neither the entire Agreement nor any separate provision hereof shall be construed against either Party pursuant to a rule of construction to the effect that an agreement or any provision thereof may be construed against the party who prepared it.

15.5    Waiver. No provision of and no default under this Agreement may be waived except by an instrument in writing signed by the Party waiving the provision or default. No waiver of any provision or default will be deemed a waiver of any other provision or default or a waiver of any prior or subsequent occurrence or nonoccurrence under the same provision or any subsequent default.

15.6    Assignment. No Party may transfer or assign its rights or obligations under this Agreement without the written consent of the other Party, except to any corporation that succeeds to the business and assets of the transferor by merger or consolidation or that purchases the business and all or substantially all of the assets of the transferor.

15.7    Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without reference to its conflicts of laws principles.

15.8    Time of Essence. Time is of the essence with respect to each provision of this Agreement as to which time is a factor.

15.9    Attorney Fees. In the event that any action, suit, arbitration, or other proceeding is brought or commenced by one Party against the other Party to enforce or interpret the terms of this Agreement or the rights or duties of any Party hereunder, the prevailing Party shall be entitled to its reasonable attorney's fees, as determined by the trial court, appellate court, or arbitrator, as the case may be.

15.10    Dispute Resolution. If at any time during the Term any dispute, difference, or disagreement shall arise upon or in respect of this Agreement, or the meaning or construction hereof, which dispute, difference, or disagreement cannot be resolved between the Parties, every such dispute, difference, or disagreement shall be referred to binding arbitration conducted, in English and in any other language or manner necessary or convenient to permit accurate communication, unfettered comprehension, and meaningful participation by the Parties, by and before a single arbitrator to be agreed upon by the Parties or, if no single arbitrator can be agreed upon within a reasonable time after, by a panel of three (3) arbitrators selected in accordance with the rules of the American Arbitration Association, and such dispute, difference, or disagreement shall be resolved by arbitration in New York, New York, in accordance with the then-prevailing commercial rules of the American Arbitration Association, and judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

15.11  <u>Severability</u>.  If any provision of this Agreement, or the application of any provision of this Agreement to any Party, person, event, or circumstance, shall be held invalid or unenforceable by a court of competent jurisdiction, then the remaining provisions of this Agreement, and the application of the remaining provisions of this Agreement to any Party, person, event, or circumstance other than those as to which it held invalid or unenforceable, narrowly construed, shall not be affected thereby and shall remain valid, enforceable, and in full force and effect.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date.

"LICENSOR"

JOSEPH DELGRECO & COMPANY, INC.,
a New York corporation

By: _____

Joseph DelGreco
Its:    President

"LICENSEE"

EAST-WEST-INTERNATIONAL (TAIWAN)
ENTERPRISES, a Taiwan corporation

By: _____
Robert Chang
Its: _____

## SCHEDULE 1

### Designs

TRADE PRODUCTS:

Conversation
Oceansand
Siesta Chaise
Deluxe
Veranda
Vendome Tables
X Base Tables
Vladimir Kagan's Capricorn series

RETAIL PRODUCTS AND INTERNATIONAL PRODUCTS:

The Capricorn Collection:    Lounge chair with arms
Armless Lounge chair
Chaise Lounge
Dining Table
Low back dining chair
High back dining chair
Bar stool
Bar Table
Sofa
Occasional Table
Serving Cart
Settee
Ottoman
Coffee Table
Console