UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------- X

EASTWEST INTERNATIONAL (TAIWAN)  :
ENTERPRISES, a corporation formed under  :
the laws of Taiwan (ROC); and VICTORIA  :
POINT CORPORATION, a corporation formed :
under the laws of the British Virgin Islands,  :

                Plaintiffs,  :

    -against-  :

JOSEPH DELGRECO & COMPANY, INC., a  :
corporation formed under the laws of the State  :
of New York; and JOSEPH DELGRECO, an  :
individual,  :

                Defendants.  :

--------------------------------------- X

Case No.:  08-CIV-6124 (DAB)

DECLARATION OF CARY B. SAMOWITZ
IN SUPPORT OF DEFENDANTS' REPLY
TO OPPOSITION TO MOTION TO STAY
ACTION IN FAVOR OF ARBITRATION
OR, IN THE ALTERNATIVE, PENDING
ARBITRATION

CARY B. SAMOWITZ, pursuant to 28 U.S.C. § 1746, declares as follows:

1.    I am a member of DLA PIPER LLP (US), counsel to defendants JOSEPH

DELGRECO & COMPANY, INC. and JOSEPH DELGRECO in the above-captioned action.  I

am admitted to practice in this Court and am familiar with this litigation.  I am making this

declaration to provide the Court with the document referred to in Defendants' Reply to

Opposition to Motion to Stay Action in Favor of Arbitration or, in the Alternative, Pending

Arbitration.

2.    Attached hereto as Exhibit 1 is a true and correct copy of Defendants' Demand for

Arbitration, submitted to the America Arbitration Association by UPS overnight delivery on

September 3, 2008.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 5, 2008.

                                                *CARY B. SAMOWITZ*

Exhibit 1

to

DECLARATION OF CARY B. SAMOWITZ
IN SUPPORT OF DEFENDANTS' REPLY
TO OPPOSITION TO MOTION TO STAY ACTION
IN FAVOR OF ARBITRATION OR, IN THE
ALTERNATIVE, PENDING ARBITRATION

Case No. 08-CIV-6124 (DAB)

**DLA PIPER**

**DLA Piper LLP (US)**
1251 Avenue of the Americas, 27th Floor
New York, New York 10020-1104
www.dlapiper.com

Barbara L. Seniawski
barbara.seniawski@dlapiper.com
T  212.335.4934
F  212.335.4501

September 3, 2008
*VIA OVERNIGHT COURIER*

Catherine Shanks
American Arbitration Association
Vice President, Case Management Center
950 Warren Avenue
East Providence, RI 02914

Re:    **Initiation of a Case before the American Arbitration Association**

Dear Ms. Shanks:

Enclosed herein are the following documents to initiate the filing of a case with the American Arbitration Association:

1.    Commercial Arbitration Rules, Demand for Arbitration (two copies);

2.    Arbitration clause contained in Exclusive Production, Distribution, and License Agreement between Eastwest International (Taiwan) Enterprises and Joseph DelGreco & Company, Inc., dated as of September 26, 2007 (two copies);

3.    Check payable to the American Arbitration Association in the amount of eight thousand dollars ($8,000) in payment of the case initiation fee.

Please feel free to contact me with any questions at the above number and address.

Very truly yours,

*Barbara L. Seniawski*

Barbara L. Seniawski

cc:    Cary Samowitz, Esq.
       David Frazee, Esq., Counsel for Respondent (by email)

Encls

EAST\42080361.1

**American Arbitration Association**
*Dispute Resolution Services Worldwide*

### COMMERCIAL ARBITRATION RULES
### DEMAND FOR ARBITRATION

*MEDIATION: If you would like the AAA to contact the other parties and attempt to arrange a mediation, please check this box.* ☐
*There is no additional administrative fee for this service.*

| Name of Respondent<br>Eastwest Int'l (Taiwan) Enterprises, et al. | | | Name of Representative (if known)<br>David Frazee, Esq. | | |
|---|---|---|---|---|---|
| Address<br>(See representative information.) | | | Name of Firm (if applicable)<br>Perkins Coie | | |
| | | | Representative's Address<br>101 Jefferson Drive | | |
| City | State | Zip Code | City<br>Menlo Park | State<br>CA | Zip Code<br>94025-1114 |
| Phone No. | Fax No. | | Phone No.<br>650-838-4300 | | Fax No.<br>650-838-4350 |
| Email Address: | | | Email Address:<br>dfrazee@perkinscoie.com | | |

The named claimant, a party to an arbitration agreement dated September 26, 2007_____, which provides for arbitration under the Commercial Arbitration Rules of the American Arbitration Association, hereby demands arbitration.

THE NATURE OF THE DISPUTE

Respondent filed a complaint in SDNY re joint venture between the parties. Respondents' claims and Claimants' to-be-raised cross claims must be arbitrated per contract. Claimant has filed a motion to stay the action in favor of arbitration, in addition to this demand.

| Dollar Amount of Claim $2,000,000.00 | Other Relief Sought: ☒ Attorneys Fees  ☐ Interest<br>☒ Arbitration Costs ☒ Punitive/ Exemplary ☒ Other decl'ry; set off |
|---|---|

AMOUNT OF FILING FEE ENCLOSED WITH THIS DEMAND (please refer to the fee schedule in the rules for the appropriate fee) $8,000.00

PLEASE DESCRIBE APPROPRIATE QUALIFICATIONS FOR ARBITRATOR(S) TO BE APPOINTED TO HEAR THIS DISPUTE:
Experience with high-end, to-the-trade seasonal furniture market.

Hearing locale New York, New York USA_____ (check one) ☐ Requested by Claimant  ☒ Locale provision included in the contract

| Estimated time needed for hearings overall:<br>_____ hours or 3_____ days | Type of Business: Claimant ___Furniture Design, etc___<br>Respondent ___Furniture Manufacturing, etc___ |
|---|---|

Is this a dispute between a business and a consumer? ☐Yes ☒ No Does this dispute arise out of an employment relationship? ☐ Yes ☒ No

If this dispute arises out of an employment relationship, what was/is the employee's annual wage range? Note: This question is required by California law. ☐Less than $100,000 ☐ $100,000 - $250,000 ☐ Over $250,000

You are hereby notified that copies of our arbitration agreement and this demand are being filed with the American Arbitration Association's Case Management Center, located in (check one) ☐ Atlanta, GA ☐ Dallas, TX ☒ East Providence, RI ☐ Fresno, CA ☐ International Centre, NY, with a request that it commence administration of the arbitration. Under the rules, you may file an answering statement within fifteen days after notice from the AAA.

| Signature (may be signed by a representative)     Date:<br>*[signature]*          3 Sept 2008 | Name of Representative<br>Cary B. Samowitz, Esq. | | |
|---|---|---|---|
| Name of Claimant<br>Joseph DelGreco & Company Inc. & Joseph DelGreco | Name of Firm (if applicable)<br>DLA PIPER US LLP | | |
| Address (to be used in connection with this case)<br>(See representative information.) | Representative's Address<br>1251 Avenue of the Americas | | |
| City | State | Zip Code | City<br>New York | State<br>NY | Zip Code<br>10020-1104 |
| Phone No. | Fax No. | | Phone No.<br>212-335-4659 | | Fax No.<br>212-335-4501 |
| Email Address: | | | Email Address:<br>cary.samowitz@dlapiper.com | | |

To begin proceedings, please send two copies of this Demand and the Arbitration Agreement, along with the filing fee as provided for in the Rules, to the AAA. Send the original Demand to the Respondent.

Please visit our website at www.adr.org if you would like to file this case online. AAA Customer Service can be reached at 800-778-7879

## EXCLUSIVE PRODUCTION, DISTRIBUTION, AND LICENSE AGREEMENT

THIS EXCLUSIVE PRODUCTION, DISTRIBUTION, AND LICENSE AGREEMENT ("Agreement") is made and entered into as of September 26, 2007 ("Effective Date"), by and among EAST-WEST-INTERNATIONAL (TAIWAN) ENTERPRISES, a corporation formed under the laws of Taiwan, ROC ("Licensee"), and JOSEPH DELGRECO & COMPANY, INC., a corporation formed under the laws of the State of New York ("Licensor") (such parties are sometimes referred to hereinafter individually as a "Party" and collectively as the "Parties").

### Recitals

A.      Licensor is in the business of designing, marketing for sale, and selling outdoor furniture and accessories.  In connection with that business, Licensor owns all right, title, and interest in and to the "DelGreco" brand name as used in the manufacture, distribution, and sale of outdoor furniture and accessories.

B.      Licensee, through certain of its wholly-owned subsidiaries and affiliates, is in the business of manufacturing, warehousing and distributing in the United States and worldwide various manufactured goods, including but not limited to outdoor furniture and accessories.

C.      Licensor has requested from Licensee, and Licensee is willing to provide to Licensor, a loan in the amount of One Million Dollars (US$1,000,000.00) (the "Loan"), subject to the covenants, terms, and conditions set forth in that certain Promissory Note (the "Note") to be made by Licensor in favor of Licensee, the maturity of which is set forth in the Note, together with that Continuing Guaranty, that certain Security Agreement, and any and all other documents and instruments to be executed and/or delivered concurrently with the Note and this Agreement (collectively, the "Loan Documents").

D.      Licensee desires to obtain from Licensor, and Licensor desires to grant to Licensee, subject to the covenants, terms, and conditions set forth in this Agreement, an exclusive license to manufacture outdoor furniture and accessories under the DelGreco brand name, to distribute the same to Licensor and its affiliates for sale within the United States and Canada, and to distribute and sell (or cause or permit others to distribute and sell in accordance with the terms of this Agreement) the same anywhere in the world outside the United States and Canada.

NOW, THEREFORE, in consideration of the Parties mutual exchange of promises set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

### Agreement

1.   **Definitions.**   As used in this Agreement, the following terms shall have the following meanings:

1.1.   "Gross Receipts" shall mean and include all revenues directly or indirectly received by Licensee's manufacturer from or for the manufacture of Retail Products or International Products, as the case may be, excluding taxes, duties, and charges for freight and insurance, and after deduction for credits or refunds for items damaged or returned. Gross Receipts do not include Licensee's receipts from any Licensed Product manufactured and supplied at reduced prices by Licensee to any distributor, sub-distributor, reseller, or affiliate for advertising, promotional, display, or other reasonable purposes.

1.2   "International Products" shall mean and include all Licensed Products sold anywhere outside the United States and Canada during the Term.

1.3.   "Licensed Products" shall mean and include all outdoor furniture and related accessories based on the designs set forth in Schedule 1, which is attached hereto and incorporated herein by reference, as the same may be amended from time to time by agreement of all Parties, that are manufactured, produced, or sold during the Term under any of the Marks, including but not necessarily limited to Trade Products, Retail Products, and International Products.

1.4   "Marks" shall mean and include the "DelGreco" brand name for outdoor furniture and related accessories, including all related trademarks, trade names, trade dress owned by Licensor and used or useful in the manufacture, distribution, and sale of the Licensed Products.

1.5   "Retail Products" shall mean and include all Licensed Products sold during the Term by or through any store, showroom, outlet, chain, retailer, or other location or seller within the United States and Canada, other than through the Trade Showroom Network.

1.6   "Trade Products" shall mean and include all Licensed Products sold by Licensor through the Trade Showroom Network during the Term.

1.7   "Trade Showroom Network" shall mean and include the New York trade showroom owned and/or operated by Licensor as of the Effective Date, all other trade showrooms (if any) opened and operated by Licensor during the Term, all trade showrooms not owned or operated by Licensor through which Licensor as of the Effective Date sells or has an existing contract or established relationship to sell Trade Products, and all such affiliated trade showrooms with which Licensor enters into such a contract or relationship from and after the Effective Date, as well as any sales representatives employed, contracted with, trained and/or overseen by Licensor who is not employed by or under contract with or to Licensee.

2.     **Term.**  This term of this Agreement (including any renewals and extensions hereof, the "Term") shall commence on the Effective Date and continue thereafter for a period of fifteen (15) years, unless sooner terminated or renewed pursuant to the terms hereof.

3.     **Grant of Exclusive License.**

3.1     <u>Exclusive License</u>.  Licensor hereby grants to Licensee an exclusive, irrevocable (except as hereinafter provided), license during the Term:

> (i)     to manufacture and produce the Trade Products solely for and on behalf of Licensor, to distribute the Trade Products solely to Licensor and its affiliates in the Trade Showroom Network, and to use and reproduce the Marks for all purposes necessary or appropriate in connection with such manufacture, production, and distribution, subject to the terms and conditions set forth in this Agreement; and

> (ii)    to manufacture, produce, distribute, market, and sell the Retail Products within the United States and Canada, and the International Products everywhere outside of the United States and Canada, and to use and reproduce the Marks for all purposes necessary for such manufacture, production, distribution, marketing, and sale, subject to the terms and conditions set forth in this Agreement.

3.2     <u>Conditions of License</u>.  The license granted under this Agreement is contingent upon and subject to Licensee's use of the Marks in accordance with the terms hereof and in conformance with Licensor's applicable trademark usage policies, which shall be communicated to Licensee from time to time by Licensor.  All uses and placement of the Marks, including, without limitation, the graphic representation of the Marks, shall be subject to Licensor's prior written approval, which approval shall not be unreasonably withheld.  Licensee shall not use any of the Marks as part of its domain name, corporate or business names, or otherwise imply that they are owned or controlled by or otherwise affiliated with Licensor.  Licensee shall not use any Marks in any manner that implies or suggests a relationship with Licensor other than that which is set forth in this Agreement.  Licensee acknowledges and agrees that it has no right, title or interest in any Marks, except for the license expressly granted under this Section 3.  Any rights in or to any Marks accruing through the use thereof by Licensee shall inure solely to benefit of Licensor.  Licensee shall not take any action that is inconsistent with Licensor's ownership of the Marks.  Without limiting the foregoing, Licensee shall not use any third party trademarks, trade names, logos or other commercial or product designations in a manner that is likely to cause confusion with respect to the Marks.  Licensee's rights to use the Marks, and all other licenses granted hereunder, shall cease immediately upon expiration or earlier termination of this Agreement (at all times performing in a way satisfactory to Licensor), except strictly as provided in Section 14 of this Agreement.

3.4    Reservation of Rights.    Any and all rights not expressly granted to Licensee herein shall remain exclusively with Licensor.

4.    Royalties.    Licensor shall be entitled to payment by Licensee of royalties in connection with Licensee's sale of Licensed Products, with no guaranteed minimum royalty, in accordance with this Section 4.

4.1    Trade Products.    Licensor shall pay for the Trade Products in accordance with Section 9 of this Agreement. Licensor shall not be entitled to payment of any royalty by Licensee or any other person or entity from the sale of any Trade Products. In addition, Licensor is responsible for any royalty payments that are owed to any third party designers entitled to any royalties stemming from Licensor's sale of any Trade Products.

4.2    Retail Products.    Licensee shall pay to Licensor a royalty of seven percent (7.0%) of Gross Receipts from the sale of any Retail Products. Licensor is responsible for any royalty payments that are owed to any third party designers entitled to any royalties stemming from the manufacture, distribution, or sale of any Retail Products.

4.3    International Products.    Licensee shall pay to Licensor a royalty of seven percent (7.0%) of Gross Receipts from the sale of any International Products. Licensor is responsible for any royalty payments that are owed to any third party designers entitled to any royalties stemming from the manufacture, distribution, or sale of any International Products.

4.4    Payment of Royalties.    Royalties payable from Licensee to Licensor under this Agreement shall be paid quarterly with respect to each three-month period ending March 31, June 30, September 30 and December 31 during the Term. Such payments will be made within thirty (30) days after the end of each such calendar quarter, and each payment will be accompanied by a statement of Gross Receipts for the three-month period involved. Notwithstanding the foregoing, the first royalty payment will be payable with respect to the period commencing on the Effective Date and continuing through December 31, 2007, and shall be due on or before January 30, 2008. Licensee may but shall not be obligated to offset against royalties payable to Licensor hereunder any amounts then owed and past due for longer than thirty (30) days from Licensor to Licensee for or related to Licensor's purchase of Trade Products. Licensee's obligation to pay royalties to Licensor hereunder shall terminate immediately upon the expiration or earlier termination of this Agreement.

4.5    Records.    Licensee agrees that it will at all times keep complete, true, and correct books of account containing a current record of sales and Gross Receipts in sufficient detail to enable the royalties payable under this Agreement to be computed and verified. Licensee further agrees to permit Licensor or its duly authorized representative or, at Licensor's option, a qualified auditor, to inspect such records at Licensee's North Carolina distribution facility, during such facility's normal business hours, by appointment upon not less than thirty (30) days prior, written request and no more than twice during any twelve (12) month period during the Term, at Licensor's sole cost and expense except as provided below. For purposes of this Section 4.5, the

term "qualified auditor" shall mean a reputable, experienced, certified public accountant who, individually or through any past or present employer or principal, has no existing or prior personal or professional relationship with Licensor, and who is not engaged to conduct the audit on a contingency basis. In the event the audit reasonably determines royalties payable to Licensor for any period during the Term of six (6) months or longer exceeds the royalties actually paid or promised to Licensor for the same period by more than five percent (5%), Licensor shall be entitled to reimbursement for the cost of such audit and remit payment for any outstanding royalties within thirty (30) days after Licensee's receipt of the notice of the results of such audit and a complete copy of the audit report.

5.    **Manufacturing.**  Except as otherwise provided in this Agreement, Licensee shall have the exclusive right and obligation during the Term to manufacture and produce all Licensed Products on behalf of Licensor pursuant to this Agreement. Designs for the Licensed Products existing as of the Effective Date shall be provided by Licensor to Licensee for use in manufacturing the Licensed Products. Subject to Licensor's final written approval, all modifications to such designs and any new Licensed Products designs shall be developed through the input and cooperation of both Parties, and both Parties shall collaborate to increase Licensed Products offerings in accordance with market conditions and other appropriate factors and considerations. Nothing in this Agreement shall impair or preclude Licensee from manufacturing, producing, distributing, or selling any goods of any nature or kind whatsoever other than the Licensed Products. Similarly, nothing in this Agreement shall impair or preclude Licensor from manufacturing, producing, distributing, or selling any goods of any nature or kind whatsoever that do not bear any of the Marks.

6.    **Quality Control.**  All Licensed Products manufactured by Licensee hereunder shall conform to the applicable quality standards and specifications for such Licensed Products as mutually agreed by the parties from time to time ("Specifications"). Licensee shall maintain appropriate test and inspection procedures to ensure maintenance of such standards of quality. Licensee shall test the Licensed Products for compliance with the respective Specifications, and shall provide to Licensor written certification at the time of each shipment that the Licensed Products meet such Specifications at the time of shipment and delivery from Licensee's manufacturing facilities. Licensee shall maintain written records of its tests of the Licensed Products for a period of five (5) years after shipment of such Licensed Products from Licensee's manufacturing facilities and shall make such records available for inspection by Licensor at Licensee's principal U.S. manufacturing facility for the License Products, during such facility's normal business hours, by appointment upon not less than thirty (30) days prior, written request or such shorter period of time as Licensee and Licensor may agree in writing. No material deviation from such Specifications and no material change to any Licensed Products, to Licensee's manufacturing methods, or to the raw materials used therein, shall be made by Licensee, in each case without the prior written consent of Licensor. Additionally, Licensee agrees to comply with all applicable laws in performing its obligations. Similarly, Licensee shall, and shall use commercially reasonable efforts to cause any and all resellers and sub-distributors appointed by Licensee to, adhere to any quality standards as may be mutually agreed to by Licensee and Licensor from time to time. In any event, at a minimum Licensee shall, and

shall cause any and all resellers and sub-distributors appointed by Licensee to: (a) perform its and their obligations in a professional, workmanlike manner in accordance with industry standards; (b) conduct its and their business in a manner that reflects favorably on Licensor and the Licensed Products; (c) not engage in deceptive, misleading or unethical practices; and (d) comply with all applicable laws.

7.    **Distribution.** Upon the Effective Date, Licensee's North Carolina warehousing and distribution facility shall become the United States Distribution Center for all Licensed Products. Except as otherwise provided in this Agreement, Licensor shall have the exclusive right and obligation during the Term to provide, at its cost, secure storage and efficient distribution of all Licensed Products between and among Licensee's manufacturing facilities and warehouses, and the Trade Showroom Network, as well as to any seller or sub-distributor of Retail Products or International Products in accordance with any separate sales or distribution agreement between Licensee and any such seller or sub-distributor. Licensee agrees to maintain an initial base stock inventory of Trade Products equal to approximately five hundred thousand dollars ($500,000). The base stock inventory for Trade Products will be adjusted by mutual agreement among Licensee and Licensor quarterly based on sales through the Trade Showroom Network, manufacturing and distribution capacity, market factors, and other considerations. Both Parties shall collaborate to increase distribution channels for Licensed Products in accordance with market conditions and other appropriate factors and considerations. Without limiting the foregoing, Licensee shall use commercially reasonable efforts to maximize distribution and sales of the Licensed Products (excluding Trade Products).

7.1.    **Existing Stock.** On or before the Effective Date, Licensee shall pick up from Licensor's Edison, New Jersey, warehouse and deliver to Licensee's North Carolina warehouse all existing stock of Licensed Products in Licensor's possession, except such products as have been sold but not delivered to customers or as Licensor may elect to hold for future sale. Licensor and Licensee shall share equally the cost of such pick-up and delivery. Licensor shall be entitled to a credit against outstanding invoices issued to Licensor by Victoria Point Corporation (Licensee's invoicing agent) for such stock, based on factory invoice prices. Nothing in this Agreement shall relieve Licensor of its obligation to pay Licensee (or Victoria Point Corporation, as the case may be) for any invoice (or partial amount thereof) that remains outstanding and unpaid after application of all such credits, and Licensor shall pay all such invoices and amounts within thirty (30) days after the Effective Date.

7.2.    **Trade Products Cushions.** Licensee shall be responsible, at Licensee's sole cost and expense, for manufacturing and providing, or causing to be manufactured and provided, all cushions for all Trade Products, using exterior-grade foam, and all covers for such cushions, using fabric to be selected and supplied by Licensor and/or Licensor's customers, in accordance with reasonable standards and specifications to be developed and agreed upon by Licensor and Licensee

8.    **Sales.**

8.1.    Trade Products.    Licensor shall have all rights and responsibilities for all sales during the Term of Trade Products anywhere within the United States and Canada. Such sales shall be conducted through the Trade Showroom Network and by sales representatives employed, contracted with, trained, and/or overseen by Licensor.

8.2.    Retail Products and International Products.    Licensee shall have all rights and responsibilities for all sales during the Term of Retail Products within the United States and Canada and of International Products anywhere else in the world.

9.    **Pricing.** All Retail Products and International Products shall be sold in accordance with price schedules determined by Licensee. Prices for all Trade Products shall be mutually agreed to by Licensor and Licensee and shall at a minimum result in a gross profit of forty five percent (45%) for Licensor from the sale of such Trade Products; provided, however, that as an inducement to Licensee to accommodate such minimum gross profits and as a condition of the same, Licensor agrees that at least two-thirds of that minimum gross profit (i.e., a 30% commission) shall be paid to trade showrooms in the Trade Showroom Network, other than trade showrooms owned and operated by Licensor, to enhance sales of Trade Products for the benefit of both Parties. All Trade Products will be sold to and purchased by Licensor on a cash-before-delivery (CBD) basis, FOB Licensee's North Carolina warehouse.

10.    **Promotion.**

10.1    Trade Products.    Marketing, advertising, and promotion of the Trade Products, and all costs incurred therefore, shall be the responsibility of Licensor. Licensee shall have no obligation to promote or pay for any promotional expenses for or related to the Trade Products.

10.2    Retail Products and International Products.    Marketing, advertising, and promotion of the Retail Products and the International Products, and all costs incurred therefore, shall be the responsibility of Licensee. Licensor shall have no obligation to promote or pay for any promotional expenses for or related to the Retail Products or the International Products.

11.    **Representations and Warranties.**    Each Party makes the following representations and warranties for the benefit of each other Party:

(i)    it has all necessary right and power to enter into this Agreement and to fully perform its obligations hereunder;

(ii)    it has not made, nor will it make, any commitment to a third party in conflict with or in derogation of its rights and obligations under this Agreement;

(iii)    it is not aware of any legal limitation, including patents, licenses, or other intellectual property rights of any nature of any third party, that could prevent it from entering into and carrying out the provisions of this Agreement;

(iv)    it is a body corporate validly existing under the laws of the place of its incorporation and is capable of suing and being sued in its own name;

(v)    it is subject to and bound by the covenants, terms, and conditions of this Agreement, which is a valid and binding obligation enforceable in accordance with its terms, subject to any statute of limitations and any laws of bankruptcy, insolvency, liquidation, reorganization or similar laws generally affecting creditors' rights and to general equitable principles;

(vi)    it acknowledges and agrees that the other Party has entered into this Agreement in reliance on the representations and warranties in this Section 11.

12.    **Indemnification.**

12.1    Indemnification.  Each Party ("Indemnitor") shall indemnify, defend and hold harmless the other Party, its affiliates and their respective directors, officers, shareholders, employees and agents ("Indemnitee"), from and against any and all third party claims (including all losses, obligations, liabilities, damages, recoveries, costs and expenses, including court costs and reasonable attorneys fees, relating thereto) (collectively, "Losses") arising out of or in connection with: (a) any violation or infringement by Indemnitor upon any common law or statutory rights of any third party, including rights relating to copyrights, patents, trade marks, contractual rights or trade secret rights (other than to the extent caused by and attributable to the acts or omissions of Indemnitee); (b) any breach of or any failure to observe or perform any of Indemnitor's covenants, representations, warranties or obligations under this Agreement; (c) with respect to Licensee as Indemnitor, any product liability or defect, including any death, illness, personal injury or property damage, arising out of or in connection with the manufacture, distribution, or other disposition of the Licensed Products (other than to the extent caused by and attributable to the acts or omissions of Licensor); and (d) with respect to Licensor as Indemnitor, any product liability or defect, including any death, illness, personal injury or property damage, arising out of or in connection with any designs or specifications provided to Licensee by or on behalf of Licensor, of, or for any Licensed Product (other than to the extent caused by or attributable to the acts or omissions of Licensee).

12.2    Indemnification Procedures.  In connection with any claim for which a Party seeks indemnification hereunder from another Party, the Party seeking indemnification: (a) shall give the Indemnitor prompt written notice of the claim, provided, however, that failure to provide such notice shall not relieve the Indemnitor from its liability or obligation hereunder,

except to the extent Indemnitor is prejudiced thereby; (b) shall reasonably cooperate with the Indemnitor, at the Indemnitor's expense, in connection with the defense and settlement of the claim; and (c) shall permit the Indemnitor to control the defense and settlement of the claim; provided, however, that the Indemnitor may not settle the claim without the Indemnitee's prior written consent, which shall not be unreasonably withheld or delayed. Notwithstanding the above, the Indemnitee, at its cost, may participate in the defense of the claim through counsel of its own choosing and shall so participate to the extent any action or proceeding includes one or more claims against Indemnitee that are not covered by or subject to the Indemnification obligations pursuant to Section 12.1.

13.    **Default.** In the event of any material breach of this Agreement, the Party alleging such breach shall give written notice of the breach to the breaching Party, including sufficient detail to enable the breaching Party reasonably to determine or understand (i) the act(s) or omission(s) by which the breach is alleged to have occurred, and (ii) the act(s) or omission(s) required or sufficient to cure the breach. If the specified breach has not been cured, whether by the specified cure or otherwise, within thirty (30) days of the breaching Party's receipt of written notice of the breach, the Party alleging the breach may terminate this Agreement by written notice given in accordance with Section 15.

14.    **Termination.** Any Party may terminate this Agreement in the event of any material breach hereof, where such breach remains uncured for a period of thirty (30) days following written notification of such breach in accordance with Section 13, by written notice to the other Party. Unless a longer period is stated in the termination notice, the termination shall be effective on the date ("Termination Date") that is thirty (30) days after the breaching Party's receipt of the termination notice.

14.1    Acceleration of Note Upon Termination. Notwithstanding anything in this Agreement or any of the Loan Documents to the contrary, upon the termination of this Agreement by Licensor or Licensee, and Licensee's election in its sole and absolute discretion by written notice to Licensor, the Loan and the Note evidencing the Loan shall immediately become all due and payable.

14.2    Post-Termination Rights. Notwithstanding anything in this Agreement to the contrary, Licensee shall have the following rights with respect to the manufacture, distribution, and sale of Licensed Products after Licensee's giving or receipt of notice of any termination of this Agreement:

(i)    to continue and complete the production and delivery of any Licensed Products that are in process upon Licensee's giving or receipt of such notice, or for which materials have as of such time been received or irrevocably ordered by Licensee that cannot in Licensee's reasonable judgment be converted to other profitable uses, and Licensee shall be entitled to payment therefor in

accordance with this Agreement and any pricing or payment arrangements then in effect related hereto;

(ii)   to continue for a period of thirty (30) days after the Termination Date to distribute and sell to Licensor any Trade Products that are on-hand in Licensee's inventory as of the Termination Date, and Licensee shall be entitled to payment therefor in accordance with this Agreement and any pricing or payment arrangements then in effect related hereto;

(iii)   to continue for a period of thirty (30) days after completion to distribute and sell to Licensor any Trade Products that are in process and being completed by Licensee as of the Termination Date in accordance with Section 14.2(i), and Licensee shall be entitled to payment therefor in accordance with this Agreement and any pricing or payment arrangements then in effect related hereto;

(iv)   to continue for a period of six (6) months after the Termination Date to distribute, market, and sell any Retail Products and International Products that are on-hand in Licensee's inventory as of the Termination Date;

(iv)   to continue for a period of six (6) months after completion to distribute, market, and sell any Retail Products and International Products completed by Licensee after the Termination Date in accordance with Section 14.2(i); and

(v)   to distribute, market, and sell any Trade Products that Licensor has not claimed, accepted, taken delivery of, and paid for in accordance with the terms of this Agreement and any pricing or payment arrangements then in effect related hereto, within the applicable time periods stated in Section 14.2(ii), and to apply the net proceeds of any such sale to payment of any amounts due and payable from Licensor to Licensee hereunder or under the Note.

Nothing in this Agreement shall relieve Licensee from the payment of any royalties accrued prior to the effective date of expiration or termination of this Agreement, it being acknowledged and agreed that such obligations shall survive any termination or expiration of this Agreement; provided, however, that Licensee may but shall not be obligated to offset against any amounts due and payable from Licensor to Licensee hereunder or under the Note any royalties payable to Licensor for Licensed Products sold after the Termination Date.

15.    **Additional Provisions.**

15.1    <u>Notice</u>.  All notices, requests, demands, claims and other communications permitted or required to be given hereunder must be in writing and shall be deemed duly given and received (i) if personally delivered, when so delivered, (ii) if sent by electronic facsimile, once transmitted to the fax number specified below and the appropriate telephonic confirmation is received, provided that a copy of such notice, request, demand, claim or other communication is promptly thereafter sent in accordance with the provisions of clause (iii) hereof, or (iii) if sent through an internationally-recognized delivery service, upon written or electronic confirmation from the delivery service that such notice, request, demand, claim or other communication having been so delivered:

|  |  |
|---|---|
| If to Licensor: | Joseph DelGreco & Company, Inc.<br>Attn: Joseph DelGreco<br>232 East 59th Street<br>New York, NY (USA)  10022<br>Tel.: (212) 688-5310<br>FAX:  (212) 688-5207 |
| With a copy to: | DLA Piper US, LLP<br>Attn:  David Mason, Esq.<br>1251 Avenue of the Americas<br>New York, NY (USA)  10020<br>Tel.: (212) 335-4500<br>FAX: (212) 335-4501 |
| If to Licensee: | East-West-International (Taiwan) Enterprises<br>Attn:  Robert Chang<br>15th Floor-3, No. 447, Section 3 Wen-Shin Road<br>Taichung, Taiwan, ROC<br>Tel.: 011-886-4-2297-9313<br>FAX: 011-886-4-2297-5083 |
| With a copy to: | Solomon, Grindle, Silverman & Spinella, A.P.C.<br>Attn: Christopher A. Lidstad, Esq.<br>12651 High Bluff Drive, Suite 300<br>San Diego, CA  92130<br>Tel.: (858) 793-8500<br>FAX: (858) 793-8263 |

15.2    <u>Entire Agreement</u>.  This Agreement contains the entire understanding between the Parties and supersedes any prior understandings and agreements between or among them with respect to the subject matter of this Agreement.

15.3    Amendment.  This Agreement may not be altered or modified except by a written amendment signed by both Parties.

15.4    Construction.  This Agreement was prepared through the mutual input, effort, and negotiation of both Parties, and neither the entire Agreement nor any separate provision hereof shall be construed against either Party pursuant to a rule of construction to the effect that an agreement or any provision thereof may be construed against the party who prepared it.

15.5    Waiver.  No provision of and no default under this Agreement may be waived except by an instrument in writing signed by the Party waiving the provision or default.  No waiver of any provision or default will be deemed a waiver of any other provision or default or a waiver of any prior or subsequent occurrence or nonoccurrence under the same provision or any subsequent default.

15.6    Assignment.  No Party may transfer or assign its rights or obligations under this Agreement without the written consent of the other Party, except to any corporation that succeeds to the business and assets of the transferor by merger or consolidation or that purchases the business and all or substantially all of the assets of the transferor.

15.7    Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without reference to its conflicts of laws principles.

15.8    Time of Essence.  Time is of the essence with respect to each provision of this Agreement as to which time is a factor.

15.9    Attorney Fees.  In the event that any action, suit, arbitration, or other proceeding is brought or commenced by one Party against the other Party to enforce or interpret the terms of this Agreement or the rights or duties of any Party hereunder, the prevailing Party shall be entitled to its reasonable attorney's fees, as determined by the trial court, appellate court, or arbitrator, as the case may be.

15.10    Dispute Resolution.  If at any time during the Term any dispute, difference, or disagreement shall arise upon or in respect of this Agreement, or the meaning or construction hereof, which dispute, difference, or disagreement cannot be resolved between the Parties, every such dispute, difference, or disagreement shall be referred to binding arbitration conducted, in English and in any other language or manner necessary or convenient to permit accurate communication, unfettered comprehension, and meaningful participation by the Parties, by and before a single arbitrator to be agreed upon by the Parties or, if no single arbitrator can be agreed upon within a reasonable time after, by a panel of three (3) arbitrators selected in accordance with the rules of the American Arbitration Association, and such dispute, difference, or disagreement shall be resolved by arbitration in New York, New York, in accordance with the then-prevailing commercial rules of the American Arbitration Association, and judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

15.11  <u>Severability</u>.  If any provision of this Agreement, or the application of any provision of this Agreement to any Party, person, event, or circumstance, shall be held invalid or unenforceable by a court of competent jurisdiction, then the remaining provisions of this Agreement, and the application of the remaining provisions of this Agreement to any Party, person, event, or circumstance other than those as to which it held invalid or unenforceable, narrowly construed, shall not be affected thereby and shall remain valid, enforceable, and in full force and effect.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date.

"LICENSOR"

JOSEPH DELGRECO & COMPANY, INC.,
a New York corporation

By: _____

      Joseph DelGreco
Its:   President

"LICENSEE"

EAST-WEST-INTERNATIONAL (TAIWAN)
ENTERPRISES, a Taiwan corporation

By: _____

    Robert Chang
Its: _____

## SCHEDULE 1

### Designs

### TRADE PRODUCTS:

Conversation
Oceansand
Siesta Chaise
Deluxe
Veranda
Vendome Tables
X Base Tables
Vladimir Kagan's Capricorn series

### RETAIL PRODUCTS AND INTERNATIONAL PRODUCTS:

The Capricorn Collection:    Lounge chair with arms
                             Armless Lounge chair
                             Chaise Lounge
                             Dining Table
                             Low back dining chair
                             High back dining chair
                             Bar stool
                             Bar Table
                             Sofa
                             Occasional Table
                             Serving Cart
                             Settee
                             Ottoman
                             Coffee Table
                             Console